SOLOMON R. GUGGENHEIM FOUNDATION, Appellant, v JULES LUBELL, Respondent. (And Third- and Fourth-Party Actions.)

First Department, January 25, 1990

## APPEARANCES OF COUNSEL

*Jeffrey Barist* of counsel *(F. Ellen Zeifer* and *Helena M. Tavares* with him on the brief; *White & Case,* attorneys), for appellant.

*Gary B. Freidman* of counsel *(Norman A. Senior* with him

on the brief; *Greenfield Eisenberg Stein & Senior,* and *Harry Torczyner,* attorneys), for respondent.

### OPINION OF THE COURT

WALLACH, J.

█ The action is one to recover a chattel pursuant to CPLR article 71, often referred to as "replevin" *(see,* Siegel, NY Prac § 337, at 411). It is brought by a museum and involves a watercolor painting, or gouache, claimed to be worth $200,000, and done by Marc Chagall in 1912 as a study for his oil painting of the same subject entitled *Le Marchand de Bestiaux (The Cattle Dealer).* The complaint alleges that the gouache was stolen from plaintiff in the mid-1960's by a person or persons unknown; that plaintiff learned of defendant's possession of the gouache in August 1985; that on January 9, 1986 plaintiff made a demand on defendant to return the gouache; and that defendant refused. Defendant's answer alleges that she and her late husband purchased the gouache in May 1967 from a reputable Manhattan gallery for $17,000 without knowledge of any defects in the gallery's title, and raises as affirmative defenses the three-year Statute of Limitations applicable to actions to recover a chattel (CPLR 214 [3]), laches, adverse possession, and her status as a good-faith purchaser for value. A motion by defendant for summary judgment based, *inter alia,* on the Statute of Limitations was granted on the ground that plaintiff's efforts to locate the gouache were not reasonably diligent in that no report of its loss was made to "the agencies which are routinely contacted when a work of art is stolen", such as the police, F.B.I., Interpol, and the Art Dealers Association, the latter of which maintains a registry of stolen art. Additional steps that plaintiff could have taken when it realized that the gouache was lost were suggested by defendant in support of her motion, including publicizing the loss in art publications and newspapers, hiring private investigators, promptly filing an insurance claim, and, most especially, notifying Chagall and the cataloguer of his works, Franz Meyer, both of whom were contacted by defendant's husband when he and defendant purchased the gouache. Plaintiff acknowledges that when it realized that the gouache was missing, the search it undertook did not extend beyond its own premises, but asserts that its decision not to report the loss to the authorities, publicize it in the art world, or actively investigate was a deliberate one, made in the belief, not uncommon in the 1960's and 1970's, that to do so

would not help locate the gouache and might even hinder its recovery by driving it further underground. We hold that whether plaintiff was obligated to do more than it did in searching for the gouache depends on whether it was unreasonable not to do more, and whether it was unreasonable not to do more is an issue of fact relevant to the defense of laches and not the Statute of Limitations. The action, therefore, should not have been dismissed as barred by the Statute of Limitations.

■ IAS relied on *DeWeerth v Baldinger* (836 F2d 103, *cert denied* 486 US 1056), a recent Second Circuit case which dismissed as time barred a replevin action to recover a stolen painting from a good-faith purchaser on the ground that the plaintiff therein did not use "due diligence" in attempting to locate the painting. Noting the "absence of controlling state authority" as to whether New York law obligates one to search for one's stolen property, and purporting to " 'make an estimate' " of how the New York Court of Appeals would rule on that question, *DeWeerth* predicts that the court "would impose a duty of reasonable diligence in attempting to locate stolen property, in addition to the undisputed duty to make a demand for return within a reasonable time after the current possessor is identified" (at 107, 108). The basis for this prediction is that the law would otherwise anomalously favor a thief over a good-faith purchaser by affording the owner of stolen property more time to sue the latter than the former. As *DeWeerth* explains, "[i]n virtually every state except New York, an action for conversion [and presumably replevin] accrues when a good-faith purchaser acquires stolen property", an accrual rule which "creates an incentive to find one's stolen property" (at 109). In New York, however, the pertinent accrual rules create such an incentive only when it is from the thief himself that stolen property is sought to be recovered. As against a thief, a cause of action for replevin accrues, and the limitations period therefore begins to run, immediately upon the occurrence of the theft (at 106, citing *Sporn v MCA Records,* 58 NY2d 482, 487-488), and this is so even if the owner does not know that a theft has occurred (at 106, citing *Varga v Credit-Suisse,* 5 AD2d 289, 291-292 [1st Dept], *affd* 5 NY2d 865, and *Two Clinton Sq. Corp. v Friedler,* 91 AD2d 1193, 1194 [4th Dept]). As against a good-faith purchaser, however, accrual is deferred, and the statute therefore does not begin to run, until a demand for return of the property has first been made and refused (at 106,

citing *Menzel v List,* 22 AD2d 647 [1st Dept], *on further proceedings* 49 Misc 2d 300, *mod as to damages* 28 AD2d 516, *revd as to modification* 24 NY2d 91), this because a good-faith purchaser of stolen property commits no wrong, as a matter of substantive law, until he has first been advised of the plaintiff's claim to possession and given an opportunity to return the chattel *(supra,* 836 F2d, at 106, 108, citing *Gillet v Roberts,* 57 NY 28). Thus, the requirement that a demand be made upon a good-faith purchaser (or indeed anyone else whose possession is not tortious) is a substantive element of the cause of action, not a procedural condition precedent to suit, and, for that reason, CPLR 206 (a), which provides that "where a demand is necessary to entitle a person to commence an action, the time within which the action must be commenced shall be computed from the time when the right to make the demand is complete", is inapplicable (at 107, citing *Frigi-Griffin, Inc. v Leeds,* 52 AD2d 805, 806 [1st Dept]; *see also,* 1 Weinstein-Korn-Miller, NY Civ Prac ¶ 206.01). In other words, absent a demand there is no cause of action for replevin against a good-faith purchaser, and absent a cause of action the statute cannot begin to run. As a result, "the thief would be immune from suit after three years [measured from the occurrence of the theft], whereas the good-faith purchaser would remain exposed as long as his identity did not fortuitously come to the property owner's attention" *(supra,* 836 F2d, at 108-109). That fortuitous knowledge of the good-faith purchaser's identity should have the effect of preventing delay in the making of a demand for return of the property, is a consequence of the "unreasonable delay rule", under which the time limited to interpose a cause of action that accrues upon the making of a demand cannot be indefinitely extended by unreasonably postponing the demand (at 107, citing, *inter alia, Austin v Board of Higher Educ.,* 5 NY2d 430, 442 [mandamus to compel]).

*DeWeerth (supra)* endeavors "to mitigate the inequity of favoring a thief over a good-faith purchaser" (at 108) inherent in these accrual rules by extending the unreasonable delay rule, heretofore held applicable only in situations where the plaintiff has actual knowledge of the facts necessary to make a demand, to situations where the plaintiff can be charged with knowledge of such facts by reference to a standard of reasonable diligence. The theory is that if delay in making a demand with knowledge of the whereabouts of stolen property is relevant in determining the timeliness of a replevin action,

delay should also be relevant if the whereabouts of stolen property could have been known with a reasonably diligent search. Thus, the fact that the action is brought soon after demand and refusal "does not end the inquiry" (at 107); inquiry must also be had into whether a reasonably diligent search could have enabled the plaintiff to make an earlier demand.

Plaintiff urges this court not to follow *DeWeerth* (836 F2d 103, *supra),* criticizing the anomaly described therein as a "mirage", and arguing that it cannot be taken for granted that this action would necessarily have to be dismissed as time barred were defendant herself the thief, since equity can intervene to estop a thief from asserting the Statute of Limitations when the thief's concealment of the theft was the cause of the delay in instituting suit (citing *General Stencils v Chiappa,* 18 NY2d 125; *see also, Kunstsammlungen Zu Weimar v Elicofon,* 678 F2d 1150, 1163 [2d Cir]). But to eliminate the anomaly by placing the thief in the same disfavored position as the good-faith purchaser is not to eliminate the potential for stale, hard-to-defend claims created by a rule that makes accrual depend on an act to be performed by the plaintiff constrained only by his fortuitous acquisition of the knowledge necessary to perform the act. When this potentiality for staleness becomes an actuality because of the plaintiff's inexcusable delay in acquainting himself with the facts that would enable him to perform the requisite act, an appeal can be made to the conscience of the court to dismiss the action as untimely notwithstanding that it was commenced within the statutory period, i.e., within three years after the demand.

This, we think, is what occurred in *DeWeerth (supra).* There, the plaintiff learned of the theft almost immediately after its occurrence, and was undiligent in her reaction to it from the start; yet, there was no finding, as such, that the cause of action accrued when the plaintiff learned of the theft or within a reasonable time thereafter. Indeed, it is questionable whether *DeWeerth* purports to fix any particular time as the point of accrual. A footnote does say that the limitations period "conceptually starts * * * at the point where the plaintiff has had an opportunity to use due diligence in locating the property and making a demand, and has failed to do so" (at 107, n 4), but no finding of fact was made as to when that point occurred and the limitations period began to run. Instead, the dismissal in *DeWeerth* appears to have been based not on the lapse of any particular period of time, but on

an estoppel. Its gist is that although the plaintiff's title to the stolen property might be lawful, she should not be heard to assert it because the delay attributable to her lack of diligence in searching for the property prejudiced the defendant in her defense. That is laches. While no express finding of prejudice, a necessary element of laches, was made, because none was thought to be needed, there was, however, an explicit reference to a deceased witness, faded memories, lost documents, hearsay testimony of questionable value, and the "injustice" of having "to defend under these circumstances" (at 112).

We agree that if actual knowledge of the whereabouts of stolen property is relevant to a determination of the timeliness of a replevin action, then, as a matter of logic, if not policy, imputed knowledge should be relevant, too. Where we disagree is that delay alone can make a replevin action untimely when knowledge is imputed. Indeed, we question whether delay alone can make a replevin action untimely even when knowledge of the whereabouts of the property is actual. To be sure, some New York authorities do say, as *DeWeerth* points out *(supra,* at 107, citing *Matter of Devens v Gokey,* 12 AD2d 135 [4th Dept], *affd* 10 NY2d 898, and *Matter of Curtis v Board of Educ.,* 107 AD2d 445 [4th Dept]), that the proscription against unreasonable delay in making a demand is not the equitable doctrine of laches, as such, since prejudice, in addition to delay, need not be shown; but, without getting mired in the historical origins of replevin *(see,* 12 Carmody-Wait 2d, NY Prac § 82:2 ["The origin and precise scope and nature of the action of replevin at common law are lost in antiquity and there has been doubt and controversy concerning them rendering it impossible to be didactic"]; *see also,* Prosser and Keeton, Torts § 15, at 88 [5th ed]), we prefer to characterize the defense urged here—lack of diligence in searching for stolen property, as opposed to unreasonable delay in making a demand upon a known possessor—as laches. Indeed, we do so mainly in order to point up that if such a defense is to be deemed meritorious, prejudice must be articulated in addition to delay. We can appreciate that it would be upsetting for defendant to be deprived of this valuable work of art, bought and paid for, possessed, cherished and proudly displayed in her living room for 22 years, and that the hurt probably would not be so great were the period of possession not so long, but, in the absence of a statute establishing title by virtue of the mere lapse of time *(compare,* CPLR 212 [a]), we think it plain that the relative possessory

rights of the parties cannot depend upon the mere lapse of time, no matter how long. Indeed, rather than harming defendant, delay alone could be viewed as having benefited her, in that it gave her that much more time to enjoy what she otherwise would not have had *(cf., Marcus v Village of Mamaroneck,* 283 NY 325, 332).

Although *DeWeerth (supra)* posits that a showing of prejudice is unnecessary, defendant seems to understand implicitly that her long-time possession of the gouache and plaintiff's long-time failure to search for it are not alone sufficient for her to prevail, and she endeavors to show more. Her argument is that the gouache would have been recovered, leaving her without an opportunity to have purchased it in the first place, had certain measures—especially reporting the loss to the Art Dealers Association and notifying Chagall and Meyer —been taken by plaintiff in 1965 immediately when it learned that the gouache was lost, and, on the theory that the purchase of the gouache constituted a prejudical change of position, a large part of a fairly extensive record is thus given over to evidence tending to support or refute the likelihood of such an early recovery. We accept the relevancy of such evidence for the purpose of showing prejudice, since plaintiff itself seems to accept it for that purpose, but, if it is the reasonableness of plaintiff's response to the theft that is in issue, we do not think the probability of an early recovery nearly so material as the custom and practice prevalent among museums in the 1960's concerning the measures to take in recovering stolen art. Plaintiff argues that there was, and, to a lesser extent, still is, much respected opinion in the trade that publicity can drive a stolen work further underground, whereas passivity and silence can encourage its resurfacing, and that the approach to take in a given instance is best left to the judgment of those most directly concerned, who should not be second-guessed by good-faith purchasers with perfect hindsight.

*DeWeerth,* for its part, voices no confidence in such a passive approach: "A rule requiring reasonable diligence in attempting to locate stolen property is especially appropriate with respect to stolen art. Much art is kept in private collections, unadvertised and unavailable to the public. An owner seeking to recover such property will almost never learn of its whereabouts by chance. Yet the location of stolen art may frequently be discovered through investigation" *(supra,* 836 F2d, at 109, citing Feldman and Burnham, *An Art Theft Archive:*

*Principles and Realization,* 10 Conn L Rev 702, 724 [1978]). There are those in the art world who would probably disagree with *DeWeerth* in this respect, it being their view that as between an innocent owner and innocent purchaser, it is the latter who should bear the loss for any number of reasons, including his voluntary entry "into a transaction to acquire material of a type that is known sometimes to be problematic"; his opportunities to "request and receive documentation", "negotiate an arrangement under which he might protect himself against the economic consequences of a subsequent third party claim", and "weigh the vendor's title"; and the fairness of "expect[ing] that those who take such risks will at least sometimes have to suffer the attendant consequences". (Weil, *Repose,* 8 IFAR Rep 6 [Aug./Sept. 1987]). We take no position as to whether an active approach is more effective than a passive one, and should therefore be encouraged through an accrual rule creating an incentive to investigate. As we see it, the question is not whether the search measures posited by defendant would have likely resulted in an early recovery of the gouache, but whether plaintiff's failure to take such measures was unreasonable, and regarded as such in the trade in the 1960's, a question of fact left unresolved on this record.

■ Aside from the question of whether plaintiff's response to the theft was unreasonable, other issues of fact abound, as is usual whenever a party's knowledge and reasonableness are in issue. Not the least of these issues is when plaintiff first realized that the gouache was missing, when plaintiff should have presumed it stolen, and whether it was unreasonable of plaintiff not to take the particular search measures urged by defendant after it realized that the gouache was missing but before it had reason to presume it stolen. If, as plaintiff asserts, it had reason not to presume the gouache stolen until a full-scale decennial inventory confirmed in April 1970 that it was not on its premises, then, obviously, defendant would not be able to argue that her purchase of the gouache in May 1967 could have been averted by measures that ought to have been taken in response to a theft. And, if it is true that it was not until July 1967 that plaintiff first had reason even to know that the gouache was missing, in the sense of not being in its usual place on plaintiff's premises, then, unless the May 1967 sale to defendant was conditional, it simply makes no sense to ask whether that sale could have

been averted by a search that plaintiff then had no reason to undertake. No argument is made by defendant that plaintiff had an obligation to be diligent not only in searching for the gouache but in safeguarding it from theft as well.

Plaintiff argues that had defendant consulted the Meyer catalogue at any time, she would have discovered that plaintiff was its most recently listed owner; in contrast, consultation of the catalogue would not at any time have revealed defendant's identity to plaintiff. Plaintiff also argues that information on the face of the bill of sale transferring the gouache to defendant, among other things, "raised bright red flags" that would have caused a prudent purchaser to suspect the provenance of the gouache enough to consult the Meyer catalogue and then make inquiry of plaintiff. It was this "failure to investigate obvious red flags", plaintiff argues, not its own ostensible lack of diligence, that led to defendant's purchase of the gouache. We comment on this argument only to point up that defendant's vigilance is as much in issue as plaintiff's diligence, which is another reason why we characterize the defense urged here as laches. The reasonableness of both parties must be considered and weighed.

There is even an issue as to when plaintiff first learned of defendant's possession of the gouache. Plaintiff fixes that point in the summer of 1985 when it fortuitously learned from a former employee then in the employ of an auction house that a transparency of the gouache had been brought by an art dealer to that auction house for an appraisal. Challenging plaintiff's credibility, defendant points to the public exhibition of the gouache in the fall of 1967 and again in the fall of 1981 by the gallery that sold it to her, and to a very close personal and professional relationship between the owner of that gallery, now deceased, and the individual with plaintiff most responsible for locating the gouache. Indeed, it might be that the question of when plaintiff first acquired actual knowledge of defendant's possession of the gouache is inherently one of credibility, inappropriate for resolution on a summary judgment motion even in the absence of affirmative proof from defendant.

Aside from the Statute of Limitations, defendant also argues that she should have been granted summary judgment because plaintiff did not come forward with proof that the gouache was stolen, suggesting that it might have been disposed of by sale. This argument is based on UCC 2-403 (1), which provides that "[a] person with voidable title has power

to transfer a good title to a good faith purchaser for value." In other words, as both sides agree, if defendant is a good-faith purchaser and the gouache was not stolen, then defendant's title is superior to plaintiff's. Arguing that plaintiff is in the best position to know what became of the gouache, and that the burden should therefore be on plaintiff to prove, rather than on herself to disprove, a theft, defendant also relies on the fact that in 1970 an insurance claim by plaintiff was rejected for lack of proof of theft. Plaintiff counters that the burden is on defendant to prove that the gouache was not stolen, and, as proof of a theft, points to defendant's bill of sale, which identifies a certain individual as a former owner of the gouache (the parties have agreed to keep his name confidential) who, as it happens, was employed by plaintiff in its mailroom in the mid-1960's and had been implicated as the thief by information known to plaintiff since 1970. No other former owners of the gouache are named in the bill of sale. Defendant argues that it was irresponsible of plaintiff not to report the information it had since 1970 to the authorities or otherwise "take any responsible action" in following it up (an argument which, we think, relates more to the defense of laches than the superiority of defendant's title under the UCC), to which plaintiff responds that the information in question was too inconclusive to have justified any action, and that it became compelling only much later upon disclosure of the bill of sale identifying the "collection" of this former mailroom employee as part of the provenance of the gouache.

■ We hold that an issue of fact exists as to whether the gouache was stolen, and that the burden of proof with respect to this issue is on defendant, it being settled that a complaint for wrongful detention contains every statement of fact essential to a recovery where it alleges the plaintiff's ownership of the property and the defendant's possession and refusal on demand to deliver (see, 23 NY Jur 2d, Conversion, and Action For Recovery of Chattel, § 175, at 422). We recognize this burden to be an onerous one, but it well serves to give effect to the principle that " '[p]ersons deal with the property in chattels or exercise acts of ownership over them at their peril' " (Prosser and Keeton, Torts § 15, at 93 [5th ed], quoting *Hollins v Fowler,* LR 7 QB 639 [1874]; *see also, Bassett v Spofford,* 45 NY 387).

The third and final ground that was urged by defendant in support of her motion for summary judgment was an alleged

abandonment of the gouache by plaintiff in 1974 when its trustees adopted a resolution "deaccessioning" the gouache from its collection. Here again, we find an issue of fact, in that the meaning of the word "deaccession", and the trustee's intent in using it in their resolution, require further elucidation. At this juncture, there is no reason to doubt plaintiff's assertion that its intent was not to abandon its claim to the gouache in the event it should later be found, but simply to indicate that, all efforts to locate it having been exhausted, it was no longer subject to internal accountability and was being removed from plaintiff's records.

A motion by plaintiff for inspection of the gouache was denied by IAS as academic when it dismissed the action. Although the motion is included in the record, no argument is made concerning it in plaintiff's brief. We therefore do not pass upon this motion, but do grant plaintiff leave to renew it, should it be so advised.

Accordingly, the order of the Supreme Court, New York County (Shirley Fingerhood, J.), entered February 14, 1989, which denied plaintiff's motion for discovery and inspection and granted defendant's cross motion for summary judgment, should be modified, on the law, to deny the cross motion, and, upon a search of the record, to dismiss the defense of the Statute of Limitations, and otherwise affirmed, without prejudice to plaintiff renewing its motion for discovery and inspection, and without costs.

SULLIVAN, J. P., CARRO, MILONAS and ELLERIN, JJ., concur.

Order, Supreme Court, New York County, entered on February 14, 1989, unanimously modified, on the law, to deny the cross motion, and, upon a search of the record, to dismiss the defense of the Statute of Limitations, and otherwise affirmed, without prejudice to plaintiff renewing its motion for discovery and inspection, without costs and without disbursements.