18-634-cv
*Zuckerman v. The Metropolitan Museum of Art*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2018

(Argued: February 27, 2019      Decided: June 26, 2019)

Docket No. 18-634

_____

LAUREL ZUCKERMAN, AS ANCILLARY ADMINISTRATRIX OF THE ESTATE OF ALICE
LEFFMANN,

*Plaintiff-Appellant,*

—v.—

THE METROPOLITAN MUSEUM OF ART,

*Defendant-Appellee.*

_____

B e f o r e:

KATZMANN, *Chief Judge,* LIVINGSTON and DRONEY, *Circuit Judges.*

_____

Plaintiff-Appellant Laurel Zuckerman appeals from the judgment of the
United States District Court for the Southern District of New York (Preska, *J.*)
dismissing her complaint for failure to state a claim. Zuckerman seeks recovery
of a painting by Pablo Picasso that has been in the Metropolitan Museum of Art's

possession since 1952. The painting once belonged to Zuckerman's ancestors, Paul and Alice Leffmann, who sold it in 1938 to a private dealer to obtain funds to flee fascist Italy after having already fled the Nazi regime in their native Germany. The district court concluded that Zuckerman failed to allege duress under New York law. We do not reach the issue of whether Zuckerman properly alleged duress because we find that her claims are barred by the doctrine of laches. Accordingly, we **AFFIRM**.

———————

LAWRENCE M. KAYE (Ross L. Hirsch, Yael M. Weitz, *on the brief*), Herrick, Feinstein LLP, New York, NY, *for Plaintiff-Appellant*.

DAVID W. BOWKER, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC; Michael D. Gottesman, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, *for Defendant-Appellee*.

Thomas J. Hamilton, John J. Byrne, Jr., Byrne Goldenberg & Hamilton, PLLC, *for Amicus Curiae* Holocaust Art Restitution Project.

Stanley W. Levy, Benjamin G. Shatz, Diana L. Eisner, Danielle C. Newman, Manatt, Phelps & Phillips, LLP, *for Amici Curiae* The 1939 Society and Bet Tzedek.

Owen C. Pell, White & Case LLP, *for Amici Curiae* Natalia Indrimi, Professor Guido Alpa, and Avv. Renzo Gattenga.

Jennifer A. Kreder, Cincinnati, OH, *for Amici Curiae* B'nai B'rith International, Raoul Wallenberg Centre for Human Rights, Simon Wiesenthal Center, Omer Bartov, Michael Berenbaum, Stuart Elliot Eizenstat, Richard Falk, Eugene Fisher, Irving Greenberg, Peter Hayes, Marcia Sachs Littell, Hubert G. Locke, Wendy Lower, Bruce F. Pauley, Carol Rittner, John K. Roth, Lucille A. Roussin, William L. Shulman, Stephen Smith and Alan Steinweis.

———————

KATZMANN, *Chief Judge*:

In the 1930s, the German government, under the control of Adolf Hitler's National Socialist German Workers' Party (the "Nazis"), launched a campaign of oppression against German Jews and other minorities. As part of its reign of terror, the Nazis and their affiliates forced Jews out of their homes, seized their businesses, and stripped them of their property. By the late 1930s, life in Germany for Jewish people became so dangerous that many were forced to flee the country. Of those who were unable to escape, most were removed from their homes, shipped to concentration camps, and murdered.

In recent decades, with the passage of time and as the number of survivors of Nazi brutality diminishes, there has been a sense of urgency that some measure of justice, albeit incomplete, be given to those victims and their heirs. International conferences and subsequent declarations have outlined principles designed to ensure, for example, that "legal systems or alternative processes, while taking into account the different legal traditions, facilitate just and fair solutions with regard to Nazi-confiscated and looted art." Prague Holocaust Era Assets Conference: Terezin Declaration, Bureau of European and Eurasian Affairs, U.S. Department of State (June 30, 2009), https://2009-

3

2017.state.gov/p/eur/rls/or/126162.htm. What was a moral imperative has appropriately been converted into statute, with such landmark legislation as the Holocaust Expropriated Art Recovery Act of 2016 (the "HEAR Act"). Pub L. No. 114–308, 130 Stat. 1524. These efforts are grounded in the recognition that the claims of survivors and their heirs must be given serious and sympathetic consideration. To facilitate the processing of such claims, the HEAR Act creates a nationwide statute of limitations for bringing claims to recover artwork and other property lost during the Holocaust era. The HEAR Act directs that every case be given individual attention, with special care afforded to the particular facts. In that effort to render justice, the law does not eliminate equitable defenses that innocent defendants may assert, where to do otherwise would be neither just nor fair.

Paul and Alice Leffmann (the "Leffmanns") were German Jews who, prior to Hitler's rise to power, enjoyed a flourishing and prosperous life in Germany. They had "sizeable assets," including a manufacturing business and multiple properties. J. App'x 33. Among the items they owned, purchased in 1912, was The Actor, a "masterwork" painting by the famed artist Pablo Picasso. *Id.* When the Leffmanns were forced to sell their business and flee Germany in 1937, they

4

lost much of their property. Once in Italy, they sold their Picasso painting to raise money to escape Hitler's growing influence in Italy and relocate to Brazil.

Plaintiff-Appellant Laurel Zuckerman is the Leffmanns' great-grandniece. Zuckerman seeks replevin of the painting from Defendant-Appellee the Metropolitan Museum of Art (the "Met"). Zuckerman argues the Leffmanns sold the Painting under duress and that the sale is therefore void. The district court (Preska, *J.*), concluding that Zuckerman had failed to adequately allege duress under New York law, dismissed her complaint.

On appeal, the Met argues, *inter alia*, that Zuckerman's claims are barred by the doctrine of laches and that such a determination can be made on the pleadings. In this Court's narrow ruling, we agree. Laches is an equitable defense available to a defendant who can show "that the plaintiff has inexcusably slept on [its] rights so as to make a decree against the defendant unfair," and that the defendant "has been prejudiced by the plaintiff's unreasonable delay in bringing the action." *Merrill Lynch Inv. Managers v. Optibase Ltd.*, 337 F.3d 125, 132 (2d Cir. 2003).[1] Here, despite the facts that the painting was a significant work by a celebrated artist, that it was sold for a substantial sum to a well-known French

---

[1] Unless otherwise indicated, case quotations omit all citations, internal quotation marks, footnotes, and alterations.

art dealer, and that it has been in the Met's collection since 1952, neither the Leffmanns nor their heirs made any demand for the painting until 2010. Such a delay is unreasonable, and the prejudice to the Met is evident on the face of Zuckerman's complaint. We further conclude that the HEAR Act does not preempt the Met's laches defense. Accordingly, we **AFFIRM** the judgment of the district court.

## BACKGROUND

The following facts are drawn from the allegations in Plaintiff-Appellant's Amended Complaint or are "matters of which judicial notice may be taken." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 123 (2d Cir. 2011).

I. The Leffmanns

Paul Friedrich Leffmann, a German Jew from Cologne, purchased The Actor, a painting by Pablo Picasso, in 1912 (the "Painting"). Mr. Leffmann and his wife, Alice, lent the Painting for various exhibitions throughout Germany in the early 20th Century. The Painting was also featured in articles, magazines, and monographs.

After the adoption of the Nuremberg Laws in September 1935, the Leffmanns' lives in Germany became untenable. Stripped of the rights and privileges of German citizenship, they were forced to sell their property and businesses to "Aryan" corporations, receiving "nominal compensation." J. App'x 34.

By 1937, it became clear that life in Germany for Jews like the Leffmanns was no longer simply difficult, but genuinely perilous. The Leffmanns decided to flee Germany for Italy. After paying exorbitant "flight taxes," the Leffmanns arrived in Italy in April 1937. They engaged in financial transactions at a loss in order to settle in Italy. For example, the Leffmanns arranged to purchase a home for 180,000 Reichsmark ("RM") but pre-agreed to later sell it back to the original owners at a substantial loss. These "triangular agreements" were common at the time, as they allowed individuals outside of Germany to acquire RM while simultaneously permitting German emigrants to circumvent "the ever-tightening regulations governing the transfer of assets" outside of the country. *Id.* at 37. Prior to fleeing Germany, the Leffmanns "arranged" for the Painting, one of their few remaining assets, "to be held in Switzerland by a non-Jewish German acquaintance." *Id.* at 35.

But by early 1938, Italy was no longer a safe place for Jews. The growing influence of Nazi Germany resulted in anti-Semitic policies—for example, in 1937, Italy's Ministry of the Interior produced a list of all German refugees (most of whom were Jewish) living in Italy—and a warm welcoming of Adolf Hitler in May 1938. The Leffmanns began to make plans to flee to Switzerland, which required money. On April 12, 1938, Paul Leffmann wrote to C.M. de Hauke, an art dealer whom the U.S. State Department later identified as dealing in Nazi-looted art, from whom Leffmann had previously rejected an offer to sell the Painting. Leffmann now sought to revive discussions about the possibility of a sale. As matters became more perilous for Jews in Italy, Leffmann "continued to try to sell the Painting through de Hauke." *Id.* at 42. "Trying to raise as much cash as possible," and in attempt to "improve his leverage to maximize the amount of hard currency he could raise," in 1938, Leffmann told de Hauke that he had rejected a $12,000 offer from another dealer. *Id.* at 42-43.

Shortly after writing to de Hauke stating he had rejected an offer for $12,000 from another dealer, Leffmann sold the Painting in June 1938 for that

very price to the Paris art dealer Käte Perls, who was acting on behalf of her former husband, Hugo Perls, and another art dealer, Paul Rosenberg. [2]

Funded partially by their June 1938 sale of the Painting (the "Sale"), the Leffmanns fled to Switzerland in October 1938. The record on appeal is unclear as to how much the Leffmanns had to pay in order to leave Italy and arrive in Switzerland, but Plaintiff-Appellant alleges that Swiss authorities required immigrants to pay substantial fees and taxes in order to enter the country. According to Plaintiff-Appellant, "[g]iven the various payments required by Switzerland . . . the Leffmanns depended on the $12,000 . . . they received from the [S]ale" in order to survive. *Id.* at 46.

Their stay in Switzerland was short. Having only been able to procure a temporary Swiss residence visa, the Leffmanns fled to Brazil. Relocating to Brazil was similarly expensive. The Leffmanns had to pay unspecified bribes to acquire the necessary documentation from the Brazilian government and deposited at least $20,000 in the Banco do Brasil. They arrived in Rio de Janeiro on May 7, 1941. Once in Brazil, they had to pay a "levy" of $4,641 imposed by the Brazilian government on all Germans living in the country. *Id.* at 46. Plaintiff-Appellant

---

[2] The selling price was $13,200, but after a 10% selling commission, the Leffmanns came away with $12,000.

avers that the Leffmanns "depended on the $12,000" from the Sale for these payments. *Id.*

The Leffmanns lived in Rio de Janeiro for six years. In 1947, after the war had ended, the Leffmanns returned to Europe and settled in Zurich, Switzerland, where they lived for the rest of their lives. Paul Leffmann died in 1956; Alice Leffmann died in 1966. While they were still alive, the Leffmanns brought a number of successful claims with the assistance of counsel for Nazi-era losses, but those claims were limited to property that was "taken in Germany" before the Leffmanns fled Germany. Oral Argument at 25:34-58, *Zuckerman v. The Metropolitan Museum Art*, No. 18-634, http://www.ca2.uscourts.gov/oral_arguments.html. The Leffmanns made no demand to reclaim the Painting.

II.     The Painting after the Leffmanns' Sale

In 1939, Paul Rosenberg loaned the Painting to the Museum of Modern Art ("MoMA") in New York. Rosenberg asked MoMA to insure the Painting for $18,000. Sometime before October 28, 1940, Rosenberg consigned the Painting to the M. Knoedler & Co. Gallery in New York. In November 1941, that gallery sold

the painting to Thelma Chrysler Foy for $22,500. Thereafter, Foy, an arts patron

noted for her gifts of prized pieces to public institutions, donated the Painting to

the Met in 1952.

Since at least 1967, when the Painting appeared in the Met's published

catalogue of French paintings, the Met's published provenance of the Painting

listed Leffmann as a previous owner. Until recently, however, the provenance

incorrectly suggested that Leffmann sold the Painting after 1912; it listed the

provenance as "P. Leffmann, Cologne (in 1912); a German private collection

(until 1938)." J. App'x 48.


III.    Procedural History

On September 8, 2010, Plaintiff-Appellant, the Leffmanns'

great-grandniece, demanded that the Met return the Painting. The museum

refused. On October 18, 2010, Zuckerman was appointed Ancillary Administratix

of the estate of Alice Leffmann by the New York Surrogate's Court.[3] On

September 30, 2016, Zuckerman filed suit in the Southern District of New York,

asserting claims for conversion and replevin on the theory that the 1938 Sale was

---

[3] On February 7, 2011, Zuckerman and the Met entered into a standstill
agreement tolling any statute of limitations as of that date.

made under duress. On February 7, 2018, the district court dismissed

Zuckerman's claims "[f]or failure to allege duress under New York law." Special

App'x 3. The district court did not address the Met's contention that

Zuckerman's claims are time-barred in New York by the statute of limitations

and laches. This appeal followed.

## DISCUSSION

On appeal, the Met argues, among other things, that Zuckerman's claims

are barred by the doctrine of laches. We agree.[4] Neither the Leffmanns nor their

heirs made a demand for the Painting until 2010. This delay was unreasonable,

and it prejudiced the Met. We further conclude that the HEAR Act, which creates

a uniform, nationwide six-year statute of limitations for claims to recover art lost

during the Holocaust era, does not preempt the Met's defense.

---

[4] Below, the Met asserted its affirmative defenses—statute of limitations and laches—but "requested that the district court address the merits-based defenses," which the district court did. Appellee's Br. 55 n.15.

I.      Standard of Review

We review *de novo* a district court's decision to grant a motion to dismiss.

*See Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009). "In so doing, we accept as

true the factual allegations of the complaint, and construe all reasonable

inferences that can be drawn from the complaint in the light most favorable to

the plaintiff." *Id.* "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007).


II.     The Doctrine of Laches

It is well established that "[w]e may . . . affirm on any basis for which there

is a record sufficient to permit conclusions of law, including grounds upon

which the district court did not rely." *Name.Space, Inc. v. Network Solutions, Inc.*,

202 F.3d 573, 584 (2d Cir. 2000). The doctrine of laches "protect[s] defendants

against unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prods.*

*Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 960 (2017). "A party

asserting a laches defense must show that the plaintiff has inexcusably slept on

13

its rights so as to make a decree against the defendant unfair. Laches . . . requires a showing by the defendant that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action." *Merrill Lynch Inv. Managers*, 337 F.3d at 132 ; *see also Matter of Stockdale v. Hughes*, 189 A.D.2d 1065, 1067 (N.Y. App. Div. 1993) ("It is well settled that where neglect in promptly asserting a claim for relief causes prejudice to one's adversary, such neglect operates as a bar to a remedy and is a basis for asserting the defense of laches . . . .").

"[M]ere lapse of time, without a showing of prejudice, will not sustain a defense of laches." *Saratoga Cty. Chamber of Commerce v. Pataki*, 100 N.Y.2d 801, 816 (2003).[5] "A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim." *Conopco Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996). Finally, laches may be decided "as a matter of law" when "the original owner's lack of due diligence and prejudice to the party currently in possession are apparent." *Matter of Peters v. Sotheby's Inc.*, 34 A.D.3d 29, 38 (N.Y. App. Div. 2006).

---

[5] Both parties rely solely on New York law in making arguments concerning laches. Therefore, we do the same.

14

a. Unreasonable Delay

First, we conclude that the delay in this case was unreasonable. The Painting is an important and well-known work by an influential and celebrated artist. The Leffmanns sold it for a substantial sum to a French dealer. The Painting was then moved to the United States, where it was acquired by a major public institution. Meanwhile, the Leffmanns were in Brazil beginning in October 1938, and Switzerland from 1947 until Alice Leffmann died in 1966.

It is evident on the face of the complaint that the Leffmanns knew to whom they sold the Painting in 1938, and Zuckerman nowhere contends that the Leffmanns, despite making some post-war restitution claims, made any effort to recover the Painting. Indeed, over seventy years passed between the sale of the painting in 1938 and Zuckerman's demand that the Met return the Painting in 2010. *See, e.g.*, *Krieger v. Krieger*, 25 N.Y.2d 364, 370 (1969) (delay of twelve years in commencing an action for declaratory judgment that a Florida divorce decree was void was an "inordinate length of time").

It is eminently understandable that the Leffmanns did not bring any claim for the Painting during the course of World War II and even, perhaps, for a few years thereafter, given their specific circumstances. However, it is simply not

15

plausible that the Leffmanns and their heirs would not have been able to seek replevin of the Painting prior to 2010. As noted above, the Leffmanns, being a financially sophisticated couple, actively and successfully pursued other claims for Nazi-era losses. This is not a case where the identity of the buyer was unknown to the seller or the lost property was difficult to locate. Indeed, the Painting was a "masterwork" of Picasso, not an obscure piece of art. J. App'x 33. Nor is this a case where the plaintiff alleges that the buyers themselves exerted any undue or improper pressure on the sellers. The Leffmanns could have contacted Käte Perls, the MoMA, or the Met. Since at least 1967, "P. Leffmann" has been listed as a prior owner of the Painting. Although that—concededly incomplete—provenance was included in the Met's published catalogue, none of the Leffmanns' heirs demanded that the Painting be returned. *See Peters*, 821 N.Y.S.2d at 68-69 (concluding that the pre-suit delay was unreasonable given that "neither the estate nor anyone in the [original owner's] family . . . attempted to recover the painting from the [subsequent purchaser], even though both families lived in Manhattan and the painting was exhibited . . . at prominent museums, galleries, and universities").

b. Prejudice

While the determination of prejudice is ordinarily fact-intensive, even at this early stage of the proceedings, based on the unusual circumstances presented by the complaint, we conclude that the Met has been prejudiced by the more than six decades that have elapsed since the end of World War II. This time interval has resulted in "deceased witness[es], faded memories, . . . and hearsay testimony of questionable value," as well as the likely disappearance of documentary evidence. *Solomon R. Guggenheim Found. v. Lubell*, 153 A.D.2d 143, 149 (N.Y. App. Div. 1990). Assuming *arguendo* that Plaintiff's central claim that the Sale is void because it was made under third-party duress is cognizable under New York law, resolution of that claim would be factually intensive and dependent on, among other things, the knowledge and intent of the relevant parties. *See* Restatement (Second) of Contracts § 175(2) (1981). No witnesses remain who could testify on behalf of the Met that the Sale was voluntary,[6] or indeed on behalf of the Plaintiff that the Painting was sold "involuntar[ily]," *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989), because the Leffmanns "had absolutely no other alternative," *Kenneth D. Laub & Co., Inc. v. Domansky*,

---

[6] Käte Perls died in 1945. Paul Rosenberg died in 1959. Hugo Perls died in 1977.

17

172 A.D.2d 289, 289 (N.Y. App. Div. 1991).[7] Nor are there first-hand witnesses

who could testify to facts relevant to the Met's possible affirmative defenses,

including whether Foy purchased the Painting in good faith. On these facts, "the

original owner[s'] lack of due diligence and prejudice to the party currently in

possession are apparent," and the issue of laches can be decided as a matter of

law. *Peters*, 34 A.D.3d at 38.[8]

---

[7] Under New York's "demand and refusal" rule, the statute of limitations is not triggered "until a *bona fide* purchaser refuses an owner's demand for return of a stolen art object." *DeWeerth v. Baldinger*, 38 F.3d 1266, 1272 (2d Cir. 1994). If this rule applies to claims for art objects sold under duress, the failure to pursue legal proceedings related to the Painting—namely, to make a demand—also prejudiced the Met by essentially extending the New York statute of limitations indefinitely. *See Peters*, 34 A.D.3d at 36. In *Peters*, the Appellate Division recognized that a consequence of New York's "demand and refusal" rule is that "there is a potential for a plaintiff to indefinitely extend the statute of limitations by simply deferring the making of the requisite demand" and that such a consideration is relevant to a laches analysis. *Id*. We do not reach the question of whether New York's "demand and refusal" rule, which unquestionably applies to stolen and looted art, applies to claims of an owner demanding the return of an art object sold under duress.

[8] *Peters* also involved a claim to recover a Nazi-era loss. In that case, in the early 1930s, the original owner of the painting at issue, Professor Curt Glaser, entrusted it to his brother, Paul, while fleeing Nazi Germany. *Id.* at 31. Paul, however, "apparently sold the work within the following year without first obtaining [Curt's] consent." *Id.* The painting ended up at a well-known art gallery in Cologne, Germany. *Id.* That gallery sold it to a steel magnate named Otten. *Id.* Otten fled Germany in 1937 but sent the painting out of the country. *Id.* at 32. Soon after learning that the painting had been sold, Curt Glaser attempted

c.  The HEAR Act

Zuckerman argues in the alternative that, because her claims are timely

pursuant to the applicable statute of limitations as codified by the HEAR Act, a

laches defense is unavailable in this case.

---

to buy it back but was rebuffed. *Id* at 31. He never "report[ed] a theft and, indeed, did not regard the painting as having been stolen." *Id.* at 35.

The painting eventually ended up in the United States, where it was exhibited in several museums and universities. *Id*. at 32. Decades later, the Otten family consigned the painting to Sotheby's which, in 2002, sold it for $1.5 million. *Id.* It was only in December 2003 that the petitioner (a descendant of Glaser's) sought to recover the painting on the theory that it was converted or otherwise misappropriated. *Id.* at 33.

The Appellate Division rejected the request for pre-action discovery to identify the new owner of the painting. It did not squarely hold whether the sale in that case constituted a conversion, finding instead that even "assum[ing] that the subject [painting] was converted," any claim for recovery was barred by the statute of limitations and the doctrine of laches. *Id.* at 37. With respect to laches, although Glaser attempted to buy back the painting soon after his brother sold it, he never made a legal claim for the painting. *Id.* at 35. Further, "[t]he delay by the Glaser family and the estate in asserting any claim of ownership during the approximately 70-year odyssey of [the painting] prejudiced the good-faith purchaser since none of the parties to the original sale of the painting—Professor Glaser, Albert Otten and Paul Glaser—are alive." *Id.* at 38. The Appellate Division determined that "the original owner's lack of due diligence and prejudice to the party currently in possession are apparent," such that the issue of laches could be decided as a matter of law, even at the pre-action discovery stage. *Id.* The Court of Appeals denied petitioner's motion for leave to file an appeal. *Matter of Peters v. Sotheby's Inc.*, 8 N.Y.3d 809 (2007).

The HEAR Act addresses the "unfair impediment" caused by "[s]tate statutes of limitations" that do not account for "the unique and horrific circumstances of World War II and the Holocaust." S. REP. NO. 114-394, at 5 (2016). The HEAR Act encourages the return of Nazi-stolen and looted artwork to Holocaust victims, heirs, and their survivors by preempting state statutes of limitations and imposes instead a uniform nationwide six-year statute of limitations. Specifically, the statute provides that "a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during [the period between 1933 and 1945] because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant . . . ." HEAR Act § 5(a).[9]

Generally, "in [the] face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 679 (2014); *see also SCA Hygiene Prods.*, 137 S. Ct. at 960 ("The enactment of a statute of limitations necessarily reflects a congressional decision that the timeliness of covered claims is better judged on the basis of a generally

---

[9] *Amicus* Holocaust Art Restitution Project ("HARP") urges us extend the HEAR Act beyond its enumerated scope and to create a federal common law cause of action for replevin for "Nazi-confiscated artwork." HARP Br. 15-30. We decline to do so.

hard and fast rule rather than the sort of case-specific judicial determination that occurs when a laches defense is asserted.").

This general rule does not apply to the HEAR Act. While the HEAR Act revives claims that would otherwise be untimely under state-based statutes of limitations, it allows defendants to assert equitable defenses like laches. The statute explicitly sets aside "defense[s] *at law* relating to the passage of time." HEAR Act § 5(a) (emphasis added). It makes no mention of defenses *at equity*. "[A] major departure from the long tradition of equity practice should not be lightly implied." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Moreover, a key Senate committee report accompanying the statute, discussed *infra*, unequivocally indicates that the Act does not preclude equitable defenses.[10] S. REP. NO. 114-394, at 7.

Allowing defendants to assert a laches defense, despite the introduction of a nationwide statute of limitations designed to revive Holocaust-era restitution

---

[10] The HEAR Act applies to claims to "recover any artwork . . . that was lost during the [Holocaust era] because of Nazi persecution." HEAR Act § 5(a). A stated purpose of the law is to recover property "stolen or misappropriated by the Nazis." *Id.* § 3(2). We need not and do not decide whether Zuckerman's claims, for recovery of art sold under duress to non-Nazi affiliates, are within the ambit of the statute. Even if we assume *arguendo* they are, her claims are nevertheless barred by the doctrine of laches.

21

claims, comports with the overall legislative scheme advanced by the HEAR Act.

One of the stated purposes of the HEAR Act is to ensure that claims to recover

art lost in the Holocaust era are "resolved in a just and fair manner." HEAR Act

§ 3(2). But the HEAR Act does not allow potential claimants to wait indefinitely

to bring a claim.[11] To do so would be neither just nor fair. At the very core of a

successful laches defense is prejudice to the defending party: even an

unreasonable delay is not fatal to a claim if there has been no harm to the other

party. Unlike a mechanical application of a statute of limitations, a laches defense

requires a careful analysis of the respective positions of the parties in search of a

just and fair solution. [12]

---

[11] The HEAR Act's six-year statute of limitations applies after "actual discovery" of the claim. HEAR Act § 5(a). The statute also contains an exception to this generally applicable rule for preexisting claims: those will still be time-barred under the applicable state statute of limitations if "(1) the claimant or a predecessor-in-interest of the claimant had knowledge of [the claim] on or after January 1, 1999; and (2) not less than 6 years have passed from the date such claimant or predecessor-in-interest acquired such knowledge and during which time the civil claim or cause of action was not barred by a Federal or State statute of limitations." *Id.* § 5(e). The Senate Report explained that Congress "recognizes the importance of quieting title in property generally and the importance that claimants assert their rights in a timely fashion." S. REP. NO. 114-394, at 10.

[12] The general principle that a codified statute of limitations prevents a defendant from asserting a laches defense does not apply to New York's applicable three-year statute of limitations for recovery of a chattel, N.Y. C.P.L.R. § 214. Even when a claim is timely pursuant to the statute of limitations, a

Finally, the legislative history of the HEAR Act makes clear that Congress intended that laches remains a viable defense to otherwise covered claims. An early draft of the bill, introduced in the Senate Committee on the Judiciary on April 7, 2016, would have explicitly swept aside a laches defense. Holocaust Expropriated Art Recovery Act, S. 2763, 114th Cong. § 5(c)(2)(A) (as introduced in Senate, Apr. 7, 2016) (permitting recovery "[n]otwithstanding . . . any . . . defense at law *or equity* relating to the passage of time (*including the doctrine of laches*)" (emphasis added)). That draft also stated that one of the purposes of the HEAR Act was to ensure that claims for the recovery of art lost during the Holocaust era were "not barred by statutes of limitations *and other similar legal doctrines* but are resolved in a just and fair manner on the merits." *Id.* § 3 (emphasis added).

---

defendant may still assert a laches defense. *See, e.g.*, *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 321 (1991) (holding that "although [defendant-]appellant's Statute of Limitations argument fails, [its] contention that the [plaintiff] did not exercise reasonable diligence in locating the painting" is relevant "in the context of [a] laches defense"). Were this not the case, plaintiffs could, as discussed *supra* n.7, delay bringing their claims indefinitely without consequence. The availability of a laches defense in this context allows courts to examine whether a plaintiff has abused New York's idiosyncratic "demand and refusal" rule in a way that is unfair to defendants, while keeping that rule in place. Thus, even if Zuckerman's claims were properly brought within the New York statute of limitations (a question we do not reach), they can still be barred by laches.

The final version of the bill, however, drops this language. Introduced in the House on September 22, 2016, and the Senate on September 29, 2016, the final version does not include any mention of laches or other equitable defenses. In addressing the amendment, which was in the nature of a substitute, the Senate Report explicitly noted that the new version "remove[d] the reference precluding the availability of equitable defenses and the doctrine of laches." *See* S. REP. NO. 114-394, at 7. Moreover, there is no mention of "other similar legal doctrines" in the purposes section of the final version of the statute. The final version notes that one of the purposes is to "ensure that claims to artwork and other property stolen or misappropriated by the Nazis are not unfairly barred by statutes of limitations but are resolved in a just and fair manner." HEAR Act § 3(2). "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23-24 (1983); *see also* Simon J. Frankel & Sari Sharoni, Navigating the Ambiguities and Uncertainties of the Holocaust Expropriated Art Recovery Act of 2016, 42 Colum. J.L. & Arts 157, 175-76 (2019) ("[B]y *removing* laches from the draft text of the statute, Congress intended laches and other equitable defenses under state law to remain available to good faith

possessors of artworks."). The HEAR act does not prevent defendants from asserting a laches defense. We emphasize that each case must be assessed on its own facts: while the laches defense succeeds here, in other cases it will fail and not impede recovery for claims brought pursuant to the HEAR Act.

## CONCLUSION

For the reasons set forth above, we conclude that the HEAR Act does not preempt the Met's laches defense and that Zuckerman's claims are barred by laches. Accordingly, we AFFIRM the judgment of the district court.