Bennigson v Solomon R. Guggenheim Found. (2024 NY Slip Op 24164)

[*1]

Bennigson v Solomon R. Guggenheim Found.

2024 NY Slip Op 24164

Decided on June 6, 2024

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on June 6, 2024
Supreme Court, New York County

Thomas Bennigson, THE NEW YORK INSTITUTE FOR SPECIAL EDUCATION, THE SALVATION ARMY, A NEW YORK CORPORATION, LEGER DES HEILS (SALVATION ARMY NETHERLANDS), JEWISH GUILD FOR THE BLIND, HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC.,SELFHELP COMMUNITY SERVICES, INC.,THE FRESH AIR FUND, THE JEWISH BOARD OF FAMILY AND CHILDREN'S SERVICES, INC.,OXFAM AMERICA, VERA PROSKE, ANA CAVATORE, TAMARA PROSKE, FACUNDO PROSKE, FRANCISCO PROSKE, MARIA PROSKE, MARIA MERCEDEZ ALBIZU, Plaintiff,

against
The Solomon R. Guggenheim Foundation, Defendant.

Index No. 650416/2023

Plaintiffs by:
KAYE SPIEGLER PLLC, 2 Park Ave Fl 14, New York, NY 10016-5702
ROWLAND & PETROFF, 2 Park Ave, New York, NY 10016-5675
Defendants by:
DAVIS POLK & WARDWELL, LLP, 450 Lexington Ave, New York, NY 10017

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51
were read on this motion to/for DISMISSAL
Upon the foregoing documents and for the reasons set forth below, the motion (Mtn. Seq. No. 002) to dismiss the Amended Complaint (the AC; NYSCEF Doc. No. 27) is granted. 
The plaintiffs are not correct that the federal Holocaust Expropriated Art Recovery Act of 2016 (the HEAR Act) precludes the equitable defense of laches. This argument was rejected by the United States Court of Appeals for the Second Circuit in Zuckerman v Metro. Museum of Art (928 F3d 186, 189 [2d Cir 2019]). In that case, heirs of the Leffmans, a Jewish family fleeing Adolf Hitler's rising influence in Italy, sued to recover a painting that was allegedly sold under duress as their ancestors fled Europe during World War II. The United States District Court for the Southern District of New York dismissed the complaint holding that the plaintiffs failed to [*2]adequately allege duress under New York law (Zuckerman v Metro. Museum of Art, 307 F Supp 3d 304, 313 [SDNY 2018], affd, 928 F3d 186 [2d Cir 2019]). On appeal, the Second Circuit affirmed on laches grounds, holding "the original owners lack of due diligence and prejudice to the party currently in possession are apparent, and the issue of laches can be decided as a matter of law" (928 F3d at 195 [citations and quotations omitted]). Indeed, not only does laches continue to be an appropriate defense following passage of the HEAR Act, it may also be resolved as a matter of law at the motion to dismiss stage where the original owner's lack of diligence and prejudice to the party currently in possession are apparent (In re Peters, 34 AD3d 29, 38 [1st Dept 2006]). 
Affording the plaintiffs every favorable inference as the Court must at this stage of the litigation ( Leon v Martinez, 84 NY2d 83, 87-88 [1994]), the undisputed alleged facts set forth in the AC and the documentary evidence establishing laches are stronger in this case than Zuckerman. As discussed more fully below, it is apparent that the plaintiffs (the Adler family and their heirs), have demonstrated at a minimum an approximately over 40 year distinct lack of diligence in not raising any concern as to the known facts and circumstances under which the Painting (hereinafter defined) was sold.[FN1]
Thus, and for the reasons set forth below, as in Zuckerman, dismissal is required. 
Briefly, the Painting was not appropriated directly by the Nazis or anyone collaborating with the Nazis. The AC alleges that it was purchased by Justin Thannhauser (J. Thannhauser, another German Jew whose family also fled Nazi Germany) outside of Nazi Germany. The Painting's whereabouts have not been hidden and the plaintiffs do not allege that they did not know or have not known of its whereabouts which might account for some delay in bringing this lawsuit or making demand for the Painting's return. It has been displayed in a number of museums publicly during World War II and thereafter. On October 24, 1963, the Painting appeared in a picture in a New York Times full page article as part of a large, planned bequest of Picassos to the Guggenheim. 
For its part, the Guggenheim did not hide the source of its acquisition or otherwise fail to conduct appropriate due diligence on the Painting's provenance either. In fact, in 1974, and prior to acquiring the Painting, the Guggenheim contacted the Adlers and asked specific questions about the Painting's provenance to which the Adler's never in anyway indicated that the Sale was tainted by duress as the plaintiffs now allege. It is unequivocal that the passage of time has resulted in deceased witnesses (including Karl Adler and his children who were in contact with the Guggenheim about the Painting in 1974, J. Thannhauser, the purchaser of the Painting, and the relevant people at the Guggenheim who were involved in the Guggenheim's acquisition and who were in prior communications with Mr. Adler's children, all of whom died after the Adler family was first contacted about the Painting and decades before the plaintiffs brought this lawsuit or otherwise expressed any concern that the Sale was tainted despite Mr. Adler and his heirs opportunities to do so), faded memories, and hearsay testimony of questionable value, as well as the likely disappearance of documentary evidence (Zuckerman, 928 F3d 186 at 194; [*3]Solomon R. Guggenheim Found. V Lubell, 153 AD2d 143, 149 [1st Dept 1990], affd, 77 NY2d 311 [1991]). Thus, affording the plaintiffs ever favorable inference, it is apparent that laches is firmly established as a matter of law and dismissal required (Leon v. Martinez, 84 NY2d 83; In re Peters, 34 AD3d 29).
Even if laches did not require dismissal, it appears that the Court is constrained to hold that the AC also fails to properly allege actionable duress under New York law. At bottom, the AC is predicated on the theory that sales of artwork by Jews fleeing Nazi Germany to anyone (including those having no connection to Nazi Germany) during the Nazi era are per se void or voidable because those sales occurred in a coercive market created by the Nazis in which the persecuted Jewish sellers were preyed upon such that the artwork was snatched up at a below market price regardless of whether there was any threatened direct consequence from the Nazis or their collaborators if the sale did not occur (tr. 5.28.24). Inasmuch as the counterparty to the Sale is not alleged to have engaged in any type of actual duress, this appears to fail to state a claim based on "economic duress" (e.g., Gershkovich v Shchukin Gallery Inc., 173 AD3d 641, 641 [1st Dept 2019]) and inasmuch as there does not appear to be any direct consequence which would be incurred as a result of failing to sell the painting to J. Thannhauser at the price sold or that the Adlers were in contact with Nazis who threatened consequences if they failed to sell the Painting to J. Thannhauser, this appears to fail to state a claim based on third-party duress (see Sherman v Sherman, 20 NYS 414, 414 [NY Com Pl 1892]). Thus, it would appear that the Court is constrained to hold that dismissal also is required based on the failure to allege actionable duress under New York law (Zuckerman, 307 F Supp 3d at 319).
The Relevant Facts and Circumstances
The Adlers' Acquisition of the Painting
This lawsuit involves Pablo Picassos's Woman Ironing (La rapassseuse) (1904), oil on canvas, 45 ¾ in. X 28 ¾ in. (116.2 cm X 73 cm), (the Painting; NYSCEF Doc No. 27, ¶ 1). It is brought by the heirs of Mr. Karl Adler, a German Jew who purchased the Painting from Heinrich Thannhauser in 1916 (id. ¶¶ 1, 30). Mr. Thannhauser and his son, J. Thannhauser, who were also Jewish, owned and ran a prestigious gallery in Munich, known as the Thannhauser Galerie, which dealt in modern art and had cultivated a Jewish clientele (id. ¶ 30; see NYSCEF Doc. No. 40). 
Nazi Germany and Karl and Rosa Adler
According to the AC, Mr. Adler and his wife, Rosa nee Jacobi were German Jews who led a prosperous life in Germany until the Nazis came to power and shattered their lives. Mr. Adler had run a leading leather manufacturing company, where he was the Chairman of the Board until he was forced to give up his position and liquidate his assets, including the Painting, at below market value in escaping Nazi persecution (NYSCEF Doc. No. 27 ¶¶ 1-4). 
The AC paints a vivid and horrifying picture of the Nazi's rise to power, antisemitism and genocide of the Jewish people, from (i) January 30, 1933, Hitler's first day at the helm of Germany, to (ii) the enactment of racist laws (including the Nuremberg Laws in 1935) directed at systematically dismantling the lives of Jewish residents, first focusing on exclusion, which (iii) quickly turned to appropriation of Jewish assets, (iv) the Nazi annexation of Sudetenland in October, 1938 (id., ¶ 45) and Austria in March, 1938, (v) which lead to widespread anti-Semitic [*4]violence, looting and destruction of Jewish property, including a series of pogroms against Jews (what would later be referred to as "Kristallnacht" or "the Night of Broken Glass") where Jewish homes and businesses were destroyed, (vi) the Nazi order in April, 1938 requiring all Jews with holdings over a low threshold to register all assets by the end of June, 1938 (id., ¶¶ 33-35, 41), and (vii) the arrest and sentencing of Jews to concentration camps (id., ¶¶ 33-34, 41, 45, 47, 50-51) and ultimately the genocide of over six millions Jews.
The AC also more specifically explains in heart-breaking detail the devasting impact the Nazis had on the Adlers' lives. It bears repeating exactly as set forth in the AC:
28. Until the start of the Nazi period, Karl and Rosa, both German Jews, lived together in Baden-Baden, Germany. In 1887, Adler joined his family's company, Adler & Oppenheimer A.G. ("A&O"). A&O was established in 1872 by Karl's father, Isaak Adler ("Isaak"), and Isaak's brother-in-law, Ferdinand Oppenheimer. In 1900, A&O was converted into a public limited liability company and Adler was appointed a member of the Management Board.
29. A&O became the leading leather manufacturer in Germany and the largest in Europe. Prior to the company's Aryanization, members of the Adler and Oppenheimer families owned approximately eighty-six percent of the capital stock of A&O. Adler was one of its major shareholders.
30. In 1916, Karl purchased the Painting from Heinrich Thannhauser, the owner of the prestigious Thannhauser Galerie in Munich, which dealt in modern works including works by Pablo Picasso. Heinrich Thannhauser and his son, Justin K. Thannhauser ("Thannhauser"), who later joined the gallery, were both Jewish, and cultivated a Jewish clientele. In 1928, the Painting was published as an illustration for an article in Deutsche Kunst und Dekoration.
31. On November 14, 1919, A&O formed a holding company, Amsterdamsche Ledermaatschappij, N.V. ("Almij"), which eventually held the Adler and Oppenheimer family shares in A&O. In 1920, the headquarters of the German operations of A&O was moved to Berlin and its Board of Directors was located in Berlin. The primary executives of the company were Adler and his cousin, Julius Oppenheimer, who jointly ran the company.
32. In or around 1932, following the 1929 stock exchange crash and the countless number of bankruptcies in Austria and Germany in 1931, Adler began to explore the possibility of selling the Painting, which at that time was located outside of Germany. Adler sought to test the market for the Painting by offering it for a price of not less than US $14,000; however, Adler did not sell the Painting at that time.
33. On January 30, 1933, Adolf Hitler came to power. Within days, racist laws directed against Jews were formulated, enacted and enforced, beginning with the exclusion of Jews from the civil service, and the social and business life of Germany, followed by the divestment of virtually all of their assets. At the same time, the Nazis began an early campaign of terror against German Jews, "encouraging" them to flee Germany, while moving rapidly to ensure they left their assets behind. Jews were subject to random arrests, beatings and constant harassment, ultimately leading to their murder en masse. Concentration camps for that purpose began to be set up across Germany, beginning with Dachau in March 1933.
34. On September 15, 1935, with the enactment of the Nuremberg Laws ("The Laws for [*5]the Protection of German Blood and German Honor"), the Nazis consolidated and extended the existing exclusionary measures against Jews. The Nuremberg Laws deprived all German Jews, including Karl and Rosa, of the rights and privileges of German citizenship, ended any normal life or existence for them and relegated them to a marginalized existence, a pivotal step toward their mass extermination.
35. The Nuremberg Laws of 1935 ushered in a process of eventual total dispossession of Jewish-owned wealth, both through what became known as "Arisierung," or Aryanization, as well as through the tax system, first by takeovers by "Aryans" of Jewish-owned businesses and then by forcing Jews to surrender virtually all their assets. The seizure of Jewish-owned assets, facilitated by stripping Jews of their citizenship rights, was an important part of the early phases of Nazi persecution. In this process, Jewish workers and managers were dismissed, and businesses and corporations belonging to Jewish owners were forcibly transferred from those owners to non-Jewish Germans, who "bought" them — often without the owners having free use of the "sale" proceeds — at prices officially approved and well below market value.
36. Neither Adler nor A&O could escape this process. In or around December 1937, Adler was forced to give up his position on the Board of Directors at A&O. Hermann J. Abs of Deutsche Bank replaced Adler as Chairman of the Board of Directors, effectively taking control of A&O in Germany.
37. By 1938, the Dutch holding company, Almij, owned 89% of A&O. The Adler and Oppenheimer families, having transferred their ownership shares in A&O to Almij, believed they had adequately protected their company interests against the ever-growing grasp of the Nazi regime. But they had underestimated the relentless policy of the Nazis to divest Jews of their assets. By August 1940, Deutsche Bank also acquired control of Almij, as well as its affiliates in France and Luxembourg. The Nazis eventually Aryanized all of the A&O holdings left in the Netherlands, stripping Adler and his family of their wealth in Germany and much of what they held in the Netherlands.
38. In 1931, the German government had instituted a flight tax (or "Reichsfluchtsteuer") to stem capital flight at a time of extreme pressure on the Reichsmark. After the Nazis' rise to power in 1933, the flight tax became a powerful instrument for stripping Jews of their assets. Thus, between 1933 and 1939, the Nazis' flight tax revenues grew exponentially, from RM 17.6 million (US $6,821,760) in 1933/34, when Jewish emigration was merely a trickle, to RM 81.4 million (US $32,743,150) in 1936/37, to RM 342.6 million (US $137,348,340) in 1938/39, by which time emigration had turned into a flood.
39. Flight tax assessments were based on wealth tax declarations, which referred to wealth in the previous year, and which were calculated at 25% of the value of the reported assets. With the one-year valuation delay, the flight tax amount typically would have been considerably higher than 25% of the assets actually owned at the time of emigration, as those who were persecuted by the Nazis suffered dramatic financial losses in the period leading up to their emigration. Consequently, the value of their assets at the time of emigration was considerably smaller than that on which their flight tax was assessed. The payment of the flight tax was necessary to obtain the no-objection certification of the tax authorities, which in turn was necessary to obtain an exit permit. Payment of the flight tax, however, did not in itself give the emigrant any right whatsoever to transfer abroad any of the remaining assets after payment of the tax.
40. When anyone was suspected of planning to flee Germany, the Reich's Exchange Control Office could impose a security payment of the full amount of flight tax that would have been due if leaving on that date. Any targeted person could be so charged. Karl and Rosa were caught in this net, and in December 1936, the Nazis levied a compulsory flight tax security payment against them in the amount of RM 201,263 (US $81,109). Adler paid the tax on May 30, 1938. At that time, Adler did not have sufficient cash at his disposal, and he was forced to sell securities in order to pay the flight tax.
41. In March 1938, the Nazis annexed Austria (the "Anschluss"), achieving a bloodless takeover of the country within days. The Anschluss was accompanied by a wave of antisemitic violence, as well as outright looting and destruction of Jewish property. The perceived need to bring order to the wild Aryanizations in Vienna provided further impetus to the Nazi regimes in Austria and in Germany to hasten the "slow" progress in arrogating all Jewish-owned assets to the Reich. Accordingly, in April 1938, the Nazi regime issued an order by which Jews possessing wealth of more than RM 5,000 ($2,012) as of April 27, 1938 were required to register all their assets by the end of June 1938. This "Census of Jewish-owned assets" was followed by a series of decrees by the Nazi government, including the "order regarding the elimination of Jews from the German economy" of November 12, 1938, and the "order regarding the utilization of Jewish assets" of December 3, 1938.
42. Upon information and belief, Adler's termination as Chairman of A&O and A&O's takeover in Germany by Deutsche Bank, together with the Anschluss and the events that followed, convinced Adler that the time for him and his family to escape Germany had arrived. Seeking to escape Nazi persecution, the Adlers fled Germany on or around June 24, 1938. Karl and Rosa sought to obtain a permanent visa for entry to Argentina, but entry into Argentina, or for that matter any South American country, had become increasingly difficult and costly. In the meantime, staying even for short periods in any European country without proof of a final long-term destination had also become difficult and costly. Thus, they were forced into an odyssey back and forth across various European countries, residing first, upon information and belief, in Oisterwijk, the Netherlands, with stops in France, and finally, Switzerland. At the time of their arrival in the Netherlands, Adler was 66 years old and no longer able to engage in professional work in a new language; by the time he could finally embark for Argentina, he was 68 years old.
43. In order for Adler to be able to obtain short-term visas in several European countries while he tried to obtain a permanent visa for Argentina, he needed large amounts of cash or gold. For example, the amounts of security deposits required by Switzerland for all émigrés, without a visa for a long-term destination could, depending on the Canton in Switzerland and the length of stay applied for, easily run to 30,000 Swiss Francs ("CHF") ($6,738). The country of final destination would have similar cash requirements for entry, especially when it concerned people too elderly to be able to take on professional work, such as the Adlers.
44. Between June 24, 1938 and October 29, 1938 (i.e., the period between Adler's flight from Germany and his sale of the Painting), the funds Adler had access to were insufficient to cover his and Rosa's anticipated costs and expenses while waiting for permission to enter Argentina. Adler could not have known how long they might need to [*6]wait before they were finally granted Argentine visas. At the same time, in 1938, any transfer of funds out of Germany required official approval. The conditions on which an emigrating Jew would be permitted to transfer anything at all resulted in a loss of virtually the entire amount of a successful transfer application. These losses were the result of a network of charges, taxes and conversion costs. Upon information and belief, neither Adler nor Rosa transferred any funds from Germany upon their flight to the Netherlands.
45. On October 1, 1938, Hitler began annexing the Sudetenland following the Munich Agreement of September 29-30, 1938. Hitler's expansionary desires and his wish to start a war were palpable. In March 1936, Hitler had remilitarized the Rhineland, sending German troops into the region. On 5 November 1937, he held a meeting with top military and foreign policy leaders (memorialized in the "Hossbach Memorandum"), where Hitler ordered preparations for an impending war. In fear of the growing Nazi threat and knowing that his planned emigration to Argentina would not be easily, and certainly not speedily, accomplished, Adler tried to ensure that he had all the means in hand to achieve their escape from Europe before it was too late. The beginning of World War II in September 1939 made emigration from Nazi Germany exceedingly difficult, and it was formally prohibited by the Nazi regime in October 1941. 
50. On November 9-10, 1938, mere days after Adler's sale of the Painting, the Nazis commenced a series of pogroms against Jews in Germany and German territories, in what is known as Kristallnacht (the Night of Broken Glass). During Kristallnacht, thousands of Jewish-owned businesses, homes, and schools were plundered and destroyed, at least 91 Jews were murdered, and some 30,000 Jewish men were arrested and sent to concentration camps. Nazi officials claimed that the Jews themselves were the cause of the Kristallnacht violence. The Nazis accordingly enacted the so-called atonement tax (Judenvermögensabgabe or Juva), under the pretense of punishment for the assassination in Paris of a German diplomat, Ernst vom Rath, which the Nazis said had triggered Kristallnacht. This tax would force German Jews to pay for the cost of the destruction of property that took place that night, but more importantly, was intended to help fill the budgetary gaps caused by Germany's exploding military expenditures. The atonement tax imposed a fine of RM 1 billion (US $403,000,000) on German Jewry and was to be paid in four installments. If the sum total did not reach the RM 1 billion goal, which it did not, a fifth installment would be, and was, levied.
51. The atonement tax applied to all German Jews, including those who had fled Germany's borders. Thus, even after their flight in June 1938, the Adlers were forced to pay the atonement tax in the amount of RM 111,978.95 (US $45,127.52). The atonement tax, as with the flight tax, had to be paid in cash or in what the authorities considered acceptable securities. Adler paid the tax with funds from his frozen bank accounts in Germany.Any assets that remained after payment of the taxes and payment of any other tax liabilities were eventually seized by the Nazis.
52. Adler and Rosa continued their flight from Europe. Upon information and belief, after several stays in France, they left the Netherlands for Switzerland, where they could stay only temporarily. Each stop required repeated cash deposits in order to receive short-term permission to stay. Finally, on April 2, 1940, the Adlers boarded a ship to Buenos Aires, Argentina from Genoa, Italy, arriving in Argentina on April 20, 1940. At the time [*7]of their arrival, Adler was 68 years old, had little or no knowledge of the language and had no possibility of taking on remunerative work.
53. By the time of Karl and Rosa's arrival in Argentina, the Nazis had stripped them of their German citizenship and confiscated the entirety of Adler's German held assets, including his bank accounts and real estate, in addition to much of what they held in the Netherlands. At the start of their flight, the value of Adler's German held assets, based on his wealth tax assessments, was put at RM 800,000 (US $322,160), three-quarters of which was in frozen bank accounts. Subsequently, Adler's bank balance was eroded by tax payments, and any funds that remained, together with Adler's real estate assets, were confiscated by decree dated April 10, 1940.
54. In an affidavit submitted to the Police Administration of Baden-Baden dated July 7, 1950, Adler provided the following description of the confiscation:
"By a resolution of the Reich government dated April 10, 1940, published in the Reichsanzeiger (official Reich gazette) of April 15, 1940, I along with my [later] deceased wife and my youngest son, were declared as having lost German nationality. In further implementation of the robbery action against the Jews, which had already begun in 1938 the Reich Minister of the Interior issued a notification on July 10, 1940, published in the Reichsanzeiger of July 15, 1940 as No. 163, by means of which all my assets were forfeited to the Reich." (Emphasis added.)
55. By August 1940, Deutsche Bank obtained 75% of the A&O stock, including the Almij shares, and was able to declare the company "Aryan" pursuant to the existing Nazi law. The company name was changed to Norddeutsche Lederwerke AG. Deutsche Bank also acquired Adler's Dutch shares in Almij, and transferred the purchase price into a Dutch blocked account, which was confiscated by the Gestapo in 1940.
(id., ¶¶ 28-55; hereinafter, collectively, the Nazi Atrocities). 
The Adlers' Alleged Duress & the Sale of the Painting to J. Thannhauser
As a part of his fund-raising efforts after fleeing Germany but before arriving in Argentina, Mr. Adler sold the Painting on October 29, 1938, to J. Thannhauser (the Sale; id., ¶ 44).[FN2]
As discussed above, at the time of the Sale, the AC alleges that Mr. Adler's German accounts were either frozen or virtually inaccessible. J. Thannhauser (who was also Jewish, and from whose father Mr. Adler purchased the Painting in 1916) had fled Germany (and his family's art gallery) and the Nazis' persecution for Paris, which facts were uncontested at oral argument (tr. 5.28.24) (NYSCEF Doc. No. 27, ¶ 46). J. Thannhauser was still living in Paris at the time of the Sale (id.). The AC alleges (i) that J. Thannhauser was aware of the Adlers' plight, (ii) that Mr. Adler would not have sold the Painting for such a price absent Nazi persecution, and (iii) that J. Thannhauser was purchasing comparable artworks from other German Jews who were fleeing Germany "and profiting from their misfortune": 
46. Thus, in a desperate attempt to raise cash needed to flee Nazi persecution and war-[*8]threatened Europe for his chosen home in South America — on October 29, 1938, Adler had no choice but to sell the Painting under duress to Thannhauser, who at that time was residing in Paris, France. This was a common practice of Jewish art collectors fleeing Germany, who frequently sold their art to raise cash once they were outside of Germany.Upon information and belief, Adler accepted a purchase price of CHF 6,887 (approximately US $1,552). This price was far below market value and less than one ninth of his asking price in 1932.
47. Upon information and belief, Adler's bank accounts in Germany were blocked at this time. The Nazis' use of blocked emigrants accounts (Sperrkonto), which gave the appearance of émigrés being allowed to take assets abroad, was another tool of dispossession by the Nazis. It was very rare for a Jew who had fled Germany to recover any of the funds in the blocked accounts. The creation of these blocked accounts was consistently followed by a seizure of the accounts by the Nazi state. This practice was eventually formalized in 1940, when the Nazis, by decree, stripped all German Jews of their German nationality and confiscated all assets remaining in Germany of those who had emigrated.
48. Thannhauser, as a leading art dealer of Picasso, must have known he acquired the Painting for a fire sale price. At the time of the sale, Thannhauser was buying comparable masterpieces from other German Jews who were fleeing from Germany and profiting from their misfortune. Thannhauser was well-aware of the plight of Adler and his family, and that, absent Nazi persecution, Adler would never have sold the Painting when he did at such a price.
49. On December 25, 1938, Thannhauser responded to an inquiry by Dr. Gerrit Willem Ovink, a Dutch professor who had contacted Adler to inquire about the Painting. Thannhauser informed Dr. Ovink that the Painting "went to him," but admonished Dr. Ovink not to tell anyone that he obtained it from Adler.
(id., ¶¶ 46-49). There is no indication in the AC that the Thannhausers were ever involved with the Nazi regime, collaborated with the Nazis or in any way were related to the Nazi Atrocities such that any actions of the J. Thannhauser should be attributed to the Nazis, and the plaintiffs agreed at oral argument that they were not (tr. 5.28.24). 
The Painting was Displayed Publicly during World War II
From February 1939 to April 1939, J. Thannhauser loaned the Painting to the Stedelijk Museum in Amsterdam (id., ¶ 65). From July 1939 to August 1939, J. Thannhauser loaned the Paining to the Museum of Modern Art (the MoMA) (id., ¶66). In October of 1939, J. Thannhauser had the Painting shipped from Paris to New York, to where he emigrated in 1940 (id., ¶¶ 66-67). 
Shortly after World War II, Rosa Adler died in 1946. Karl Adler died in 1957, with his three children receiving equal one-third shares of his estate (id. ¶¶ 57-58). 
In 1963, the New York Times Runs a Full-Page Article announcing that Thannhauser is to bequeath the Painting
In or around October 1963, J. Thannhauser informed the Guggenheim that he would bequest his collection, including the Painting, to them at his death (id., ¶ 68). The New York Times ran a full-page article on October 24, 1963, entitled "Guggenheim Gets Major Art Works — Gift Will Eventually Bring 34 Picassos to Museum" describing the planned bequest (the Article; NYSCEF Doc. No. 38). The Article identifies the donor as "Mr. Thannhauser of 12 East 67th Street," and prominently features a photograph of the Painting (id.). 
In 1974, before receiving the Painting and while J. Thannhauser was still alive, the Guggenheim contacted the Adlers
Following the Article, the Guggenheim researched the Painting's provenance and in fact contacted Eric Adler (Karl Adler's eldest son), by letter dated September 27, 1974, which letter was sent to a "Hotel Surrey," located at 20 East 76th Street, New York, NY 10021 — to inquire about, among other things, the acquisition and disposition of the Painting from Karl Adler's collection:
Dear Dr. Adler
The Solomon R. Guggenheim Museum is preparing a detailed catalogue of the works in the museum from the Thannhauser Foundation. This will be edited by me and Vivian Endicott Barnett. In the literature on Picasso, we find that his important early picture of the Woman Ironing ( Die Buglerin ) was once in the collection of Karl Adler (Berlin and Amsterdam).
Could you verify this reference. Would you be able to tell as the period of time the painting was in the Adler collection? We would like to know when and from where Karl Adler acquired the picture and when it left his collection.
To refresh your memory of the work I enclose a reproduction.
Your assistance in this matter will be greatly appreciated.
Sincerely,
Daniel Catton Rich
Trustee, The Solomon R. Guggenheim Museum
(NYSCEF Doc. No. 39). Eric Adler responded a few weeks later indicating that his parents had purchased the Painting in 1916 and kept it until 1939. Significantly, he did not indicate, explain or otherwise mention that the Painting had been sold under duress to J. Thannhauser, nor did he suggest anything remotely untoward about its disposition or otherwise make demand for its return:
Dear Mr. Rich:
In Reply to your letter of Sep.27,74 I herewith inform you that my parents bought ,Die Bueglerin' by Picasso 1916 from an Art Gallery in Europe Munich and kept the painting till 1939.
In case you would need additional in-formation I suggest you contact my sister, Mrs.Carlota de Landsberg who is living at the same address.
It would interest me to hear from you who gave you my name and the address to which I moved only recently.
Sincerely,
[signature]
(NYSCEF Doc. No. 40 [cross-out in original]). The AC does not allege that Eric Adler took any actions to recover the Painting at any point in his life and in fact merely indicates that his father passed away leaving general bequests and that Eric Adler passed away (see, e.g., NYSCEF Doc. No. 27, ¶¶ 57-58, 60). 
The Guggenheim's Trustee and J. Thannhauser both die in 1976 and the Guggenheim accessions the Painting in 1978 — four years after contacting Eric Adler
On October 18, 1976, Mr. Daniel Catton Rich, the Guggenheim trustee who had researched the Painting's provenance and exchanged letters with Eric Adler, died (NYSCEF Doc. No. 43). J. Thannhauser died shortly thereafter on December 26, 1976 (NYSCEF Doc. No. 27, ¶ 69). The Painting was bequeathed to the Guggenheim two years later, in whose collection it has remained available for public viewing (id.).[FN3]

Adler's Children die in the 1990s, and the Guggenheim Director dies in 2013
Mr. Adler's three children, Juan Jorge, Eric, and Carlota, died in 1989, 1990, and 1994, respectively (id. ¶¶ 59-61). In May of 2013, Mr. Thomas M. Messer, who had been the director of the Guggenheim since 1961 and during the accession of the Painting, died (NYSCEF Doc. No. 44). 
Plaintiffs allege that it was not until in November 2013 that they first learned of their claim
In November of 2013, Plaintiff Thomas Bennigson "learned for the first time that his family might have a possessory interest in the Painting, and shortly thereafter retained the law firm of Rowland & Associates to research his family's possible claim to the Painting" (NYSCEF Doc. No. 27, ¶ 70). 
The Passage of the HEAR Act
On December 16, 2016, President Barack Obama signed the HEAR Act into law. Simply put, the HEAR Act was created to revive claims otherwise barred by the statute of limitations so that victims of the Holocaust atrocities and their heirs could seek justice and recovery of the property from which they were unlawfully and inhumanely separated:
It is estimated that the Nazis confiscated or otherwise misappropriated hundreds of thousands of works of art and other property throughout Europe as part of their genocidal campaign against the Jewish people and other persecuted groups. This has been described as the "greatest displacement of art in human history".
Following World War II, the United States and its allies attempted to return the stolen artworks to their countries of origin. Despite these efforts, many works of art were never reunited with their owners. Some of the art has since been discovered in the United [*9]States. 
Victims of Nazi persecution and their heirs have taken legal action in the United States to recover Nazi-confiscated art. These lawsuits face significant procedural obstacles partly due to State statutes of limitations, which typically bar claims within some limited number of years from either the date of the loss or the date that the claim should have been discovered. In some cases, this means that the claims expired before World War II even ended. [ ] The unique and horrific circumstances of World War II and the Holocaust make statutes of limitations especially burdensome to the victims and their heirs. Those seeking recovery of Nazi-confiscated art must painstakingly piece together their cases from a fragmentary historical record ravaged by persecution, war, and genocide. This costly process often cannot be done within the time constraints imposed by existing law.
Federal legislation is needed because the only court that has considered the question held that the Constitution prohibits States from making exceptions to their statutes of limitations to accommodate claims involving the recovery of Nazi-confiscated art. In Von Saher v. Norton Simon Museum of Art, 592 F.3d 954 (9th Cir. 2009), the United States Court of Appeals for the Ninth Circuit invalidated a California law that extended the State statute of limitations for claims seeking recovery of Holocaust-era artwork. The Court held that the law was an unconstitutional infringement of the Federal Government's exclusive authority over foreign affairs, which includes the resolution of war-related disputes. In light of this precedent, the enactment of a Federal law is necessary to ensure that claims to Nazi-confiscated art are adjudicated in accordance with United States policy as expressed in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration.
(Pub L. No. 114—308, 130 Stat. 1524, § 2). Given this backdrop, and given that the number of survivors of Nazi Atrocities has dwindled in the modern era, Congress felt impelled by the sense of urgency that justice be speedily given to holocaust victims and their heirs and that current law might not facilitate that justice (see Zuckerman, 928 F3d at 189). Thus, in order to ensure that "legal systems or alternative processes, while taking into account the different legal traditions, facilitate just and fair solutions with regard to Nazi-confiscated and looted art," [FN4]
 Congress passed the HEAR Act (id.). To facilitate the claims of Holocaust survivors and their heirs, the HEAR Act creates a national statute of limitations for bringing claims to recover property lost during the Holocaust, which had the effect of reviving claims to Nazi-confiscated property that would otherwise be untimely under state-based statutes of limitations. To ensure that justice is indeed done, the HEAR Act does not however eliminate equitable defenses that innocent defendants may assert, where to do otherwise would be neither just nor fair (id.). Recently, on March 5, 2024, the U.S. Department of State announced guidelines to reflect "legally non-binding but morally important best practices" in the hope that countries will "apply the best practices that follow in accordance with national laws" in applying the HEAR Act to sales under duress by the Nazis, the Fascists and their collaborators (which the Thannhausers are not alleged to have been): 
B. "Nazi-confiscated" and "Nazi-looted" refer to what was looted, confiscated, sequestered, and spoliated, by the Nazis, the Fascists and their collaborators through various means including but not limited to theft, coercion, and confiscation, and on grounds of relinquishment, as well as forced sales and sales under duress, during the Holocaust era between 1933-45.
C. Taking into account the specific historical and legal circumstances in each case, the sale of art and cultural property by a persecuted person during the Holocaust era between 1933-45 can be considered equivalent to an involuntary transfer of property based on the circumstances of the sale.
(NYSCEF Doc. No. 53). 
Three Years and Two Months after allegedly discovering their potential claim (and some over 40 years since the Guggenheim first contacted the Adlers about the Painting), the plaintiffs make their First Demand for the Painting
On January 24, 2017, counsel to the plaintiffs contacted the Guggenheim, and on June 10, 2021, they demanded return of the Painting (id., ¶ 72). This was over 80 years since the Sale, 47 years since the Guggenheim first contacted Eric Adler about the Painting, 45 years since both J. Thannhauser and the Guggenheim Trustee who researched the Painting's provenance (Mr. Catton Rich, who had exchanged letters with Eric Adler) passed away, over 40 years after the Guggenheim accessioned the Painting, 27 years after the last of Mr. Adler's children passed away, eight years after Guggenheim's director, Mr. Thomas Messer who oversaw the accession, passed away, and five years after the HEAR act was enacted.
On December 14, 2022, the plaintiffs entered into a standstill agreement with the Guggenheim, tolling the statute of limitations as of that date (id., ¶ 76). The Painting currently remains in the possession of the Guggenheim (id., ¶ 77).
The plaintiffs brought this lawsuit asserting causes of action for replevin, conversion, unjust enrichment and declaratory judgment. The defendant moves to dismiss. 
Discussion
I. The plaintiffs' claims are barred by laches even if they are timely
The equitable doctrine of laches bars the claims of a plaintiff whose unreasonable delay in prosecuting a claim or protecting a right has worked to prejudice rights of the defendant (SCA Hygiene Products Aktiebolag v First Quality Baby Products, LLC, 580 US 328, 333 [2017]). A delay of as little as one year has been held sufficient to establish the defense (Philippine Am. Lace Corp. v 236 W. 40th St. Corp., 32 AD3d 782, 784 [1st Dept 2006]). Knowledge of prior generations is imputed to current claim making heirs such that the clock does not reset for each successive generation. If the opposite were the case, it would defeat the purpose of the doctrine (Bakalar v Vavra, 500 Fed Appx 6, 8 [2d Cir 2012]). Courts have held that laches is appropriate where the delay results in deceased witness, faded memories, lost documents, hearsay testimony of questionable value, and the "injustice" of having "to defend under these circumstances" (Solomon R. Guggenheim Found. v Lubell, 153 AD2d 143, 149 [1st Dept 1990], affd, 77 NY2d 311 [1991]). Where the original owner's lack of due diligence and prejudice to the party currently in possession are apparent, the issue may be resolved as a matter of law (In re Peters, [*10]34 AD3d 29, 38 [1st Dept 2006]). 
Laches and other equitable defenses have been applied by courts to claims which might otherwise have been revived under the HEAR Act. The HEAR Act explicitly precludes application of "defense[s] at law relating to the passage of time" but does not interfere with the application of defenses at equity, such as laches (Pub L. No. 114—308, 130 Stat. 1524, § 5[a]; Zuckerman v Metro. Museum of Art, 928 F3d 186, 196 [2d Cir 2019]; Reif v Art Inst. of Chicago, 2023 WL 8167182, at *1 [SDNY Nov. 24, 2023], reconsideration denied sub nom. Timothy Reif, et al., Plaintiffs, v The Art Institute of Chicago, Defendant, 2024 WL 838431 [SDNY Feb. 28, 2024]). 
Reif v Nagy is an instructive example of a Nazi-looting case where the heirs were awarded ownership of property because (i) laches did not bar recovery based on the specific facts of that case and (ii) duress had obviously tainted the chain of title as to the Schieles (hereinafter defined) at issue in that case (175 AD3d 107 [1st Dept 2019]). In other words, the Reif court did not hold that laches was not available in cases involving the HEAR act. Rather, the Reif court held that laches was available but under the facts of that case, the doctrine of laches did not bar recovery.
In Reif, the plaintiffs sought recovery of two Egon Schiele works (the Schieles) held by an independent dealer (id., at 109). The Schieles had essentially been stolen from the plaintiffs' ancestor, Mr. Grunbaum, by the Nazi regime. First, the Nazis imprisoned Mr. Grunbaum in the Dachau Concentration Camp. The Nazis then passed a law requiring Jews with property valued over a certain threshold to declare and forfeit that property to the Nazi regime. The Nazis then forced Mr. Grunbaum, while he was imprisoned in a concentration camp, to sign a power of attorney in favor of his wife so that she could liquidate his assets and hand the proceeds over to the Nazi regime. Both Mr. Grunbaum and his wife themselves met untimely ends at the hands of the Nazis. (Id., at 109-111.) The Schieles allegedly ended up in the possession of Mr. Grunbaum's sister-in-law, Mathilde, during World War II (though the Reif court did not credit such allegation, specifically noting that even if she did have possession, this was not equivalent to title) (id., at 127). The Schieles did not actually surface until 1956 at an art gallery in Switzerland (id., at 114). The Appellate Division held that laches was not a bar to recovery in that case because (i) the then-current owner of the Schieles had acquired them in 2013, (ii) he suffered no change in position, (iii) he purchased the Schieles at a substantial discount in light of the works' blighted provenance, (iv) he specifically insured the Schieles against the plaintiffs' title claims, and (v) no evidence was lost between his acquisition of the Schieles and the plaintiffs' demand for return (id., at 130). Thus, application of the equitable doctrine of laches was not appropriate. The Reif court concluded that the estate did not necessarily have absolute title to the artworks, only one superior to the private collector currently in possession in light of the foregoing (id., at 132). However, and as discussed above, the Reif court did not hold that laches was not available as a defense in a case involving claims revived on the HEAR Act.
The court held simply that it did not apply in that case.
As discussed above, in Zuckerman v Metro. Museum of Art (928 F3d 186 [2d Cir 2019]), the Second Circuit explicitly held that laches is an available defense to claims revived under the HEAR Act. In that case, the Second Circuit applied New York law to a Nazi-era artwork recovery action and held that the facts of that case established laches and precluded the claim. More specifically, in Zuckerman, the Leffmans were stripped of their property rights and were forced to sell their property and businesses to "Aryan" corporations for only "nominal compensation" (id., at 190). The Leffmans engaged in a so-called "triangular agreement" by [*11]which they purchased a house but also pre-agreed to later sell it back to the (non-Nazi) counterparty at a substantial loss — this was one of the few methods of moving money to avoid the "the ever-tightening regulations governing the transfer of assets" outside of Germany, which reflected their desperation (id., at 190-91). There was no mention of any direct Nazi-intervention in these sales. The painting at issue in that case was sold in 1938 to Mr. Rosenberg (there was no allegation he had any relationship whatsoever with the Leffmans) who loaned it to the Museum of Modern Art (the MoMA) for a short time (id., at 191). In 1952, the painting was donated to the Metropolitan Museum of Art (the Met), where it resided ever since (id.). The Leffmans successfully escaped to Brazil in October 1938 and returned to Switzerland in 1947, where they lived out the remainder of their lives (the wife surviving the husband and living until 1966) (id., at 193). After they returned to Switzerland, the Leffmans pursued their Nazi-era losses but never pursued the painting at issue in Zuckerman (id.). Neither the Leffmans nor their heirs made demand for the artwork until 2010 (id., at 190). On these facts, the Second Circuit found undue delay in that (i) the Leffmans were a financially sophisticated couple who actively and successfully pursued other claims for Nazi-era losses, (ii) they knew the identity of the buyer, (iii) the lost property was not difficult to locate, (iii) the plaintiffs did not allege that the buyers themselves exerted any undue or improper pressure on the sellers, (iv) the original owners and their heirs could have contacted the purchasing dealer, the MoMA, or the Met at any time but did not, (v) since at least 1967, the Met listed the Leffmans as prior owners (with some slight but inconsequential inaccuracy as to the dates), and (vi) none of the heirs demanded that the painting be returned until 2010 (id., at 194). The Second Circuit likewise found prejudice in that the approximately 60 year delay since the end of World War II resulted in "deceased witness[es], faded memories, ... and hearsay testimony of questionable value" as well as the likely disappearance of documentary evidence (id., 193-194 [quoting Solomon R. Guggenheim Found. v. Lubell, 153 AD2d 143, 149, 550 N.Y.S.2d 618 (1990)]).[FN5]

As discussed above, and giving the plaintiffs every favorable inference as the Court must ( Leon v Martinez, 84 NY2d 83), it is apparent at this stage of the litigation that laches requires dismissal. As in Zuckerman, decades have elapsed since the Sale (over 80 years) and the AC acknowledges that all of the individuals who could testify with direct knowledge that the Sale was tainted, as to the coercive environment that the Sale occurred in or as to why this claim was not brought earlier have passed away, including Karl Adler and his wife who passed away in 1946 and 1957, respectively, J. Thannhauser who passed away in 1976, Karl Adler's children who passed away in 1989, 1990 and 1994 (some 20 years after the Guggenheim first contacted them about the Painting and its provenance), Mr. Catton Rich (who had been in direct contact with Eric Adler about the Painting) who passed away in 1976, and Mr. Messer of the Guggenheim (who oversaw the bequest) who passed away in 2013 (id., ¶¶ 57-63; 68 & 69; NYSCEF Doc. No. 44). Undeniably, the Guggenheim is prejudiced by this substantial delay and lack of diligence such that dismissal is required (see Zuckerman v Metro. Museum of Art, 928 F3d 186, 194 [2d Cir 2019]).
To be clear it is not just the passage of time and the death of the relevant witnesses that [*12]establishes laches and requires dismissal. The AC asserts without appropriate explanation that it was only in 2013 that Plaintiff Bennigson "learned for the first time that his family might have a possessory interest in the Painting" (NYSCEF Doc. No. 27, ¶71), but this "first time" discovery 80 years post-Sale and approximately 47 years after the Guggenheim asked Eric Adler about the Adlers' connection to the Painting demonstrates an insurmountable lack of diligence in connection with a famous painting, which has been on prominent display at the Guggenheim since at least 1978 and at other museums essentially since its Sale, including being on display while World War II was still raging (see Clark v Hemphill Artworks, LLC, 2024 WL 1157170, at *9-10 [SDNY Mar. 16, 2024] [finding laches under New York law owing to plaintiff's failure to act for 26 years, despite plaintiff's certainty of the painting's whereabouts and where plaintiff was convinced she was legally entitled to the return of the painting]). 
As discussed above, in the 1970s, the Guggenheim sought out Eric Adler (and much to the latter's surprise, successfully located him) and specifically requested his assistance in confirming the provenance of the Painting. No one, including Eric Adler, voiced any concerns of any kind about the Sale or the circumstances surrounding the Sale. Indeed, Eric Adler's only query was as to how the Guggenheim located him and, instead of articulating any concern over the circumstances under which his father sold the Painting, he merely confirmed the dates of his parents' ownership. As such, and as in Peters, the plaintiffs' claim some 80 years after the fact that the Sale to a non-Nazi collaborator might have been improper, tainted and therefore void must be dismissed (34 AD3d 29, 35 [1st Dept 2006]). 
II. The AC does not appear to state a claim based on either economic duress or third-party duress
A. Economic Duress
Under New York Law, a contract may be voided on the grounds of economic duress where the complaining party was compelled to agree to its terms by means of (i) a wrongful threat which (ii) precluded the exercise of its free will (Stewart M. Muller Const. Co., Inc. v New York Tel. Co., 40 NY2d 955, 956 [1976]). Critically, under New York law, the threat or wrongful action must come from one of the parties to the transaction (Gershkovich v Shchukin Gallery Inc., 173 AD3d 641, 641 [1st Dept 2019]; Reid v IBM Corp., 95 CIV. 1755 (MBM), 1997 WL 357969, at *7 [SDNY June 26, 1997]). As a general rule, duress by other than the opposing party to a contract cannot constitute compulsion sufficient to void the contract (Evans v Waldorf-Astoria Corp., 827 F Supp 911, 914 [EDNY 1993], affd, 33 F3d 49 [2d Cir 1994]; In re MBM Entertainment, LLC, 531 BR 363, 412 [Bankr SDNY 2015] [duress exercised by a third person does not affect the rights of an obligee who does not participate therein]). General economic conditions or even the economic pressure felt during the undeniably horrific circumstances of the Nazi (or Fascist) regime are not sufficient to prove duress where the counterparty played no part in producing the economic pressures (Zuckerman v Metro. Museum of Art, 307 F Supp 3d 304, 319 [SDNY 2018], affd, 928 F3d 186 [2d Cir 2019]; Bakalar v Vavra, 819 F Supp 2d 293, 300 [SDNY 2011], affd, 500 Fed Appx 6 [2d Cir 2012]). Direct involvement of the Nazi regime in confiscating, directly purchasing, or forcing liquidation of property (for example forcing sale through a Nazi-controlled auction house), however, can support an inference of duress (Bakalar, 819 F Supp 2d at 300; Vineberg v Bissonnette, 529 F Supp 2d 300, 307 [DRI 2007] [applying Rhode Island law but citing only New York law in [*13]discussing the unlawful taking of artwork], affd, 548 F3d 50 [1st Cir 2008]).[FN6]
As discussed above, J. Thannhauser is not alleged to have connection to the Nazis as a collaborator or otherwise. Thus, under New York law, the Court is constrained to hold that the AC does not state a claim based on economic duress. 
B. Third-Party Duress
In opposition to the motion, the plaintiffs argue that that the claims are predicated on a theory of third-party duress and not merely economic duress and that, as such, dismissal is not appropriate. In support of this argument, the plaintiffs rely primarily on the seminal case of Sherman v Sherman, 20 NYS 414, 414 [NY Com Pl 1892], which voided a coerced marriage under the threat of imprisonment or death, and two federal cases — Aylaian v Town of Huntington (459 Fed Appx 25, 27 [2d Cir 2012]) and Oquendo v CCC Terek (111 F Supp 3d 389, 409 [SDNY 2015]) where the federal courts did not void the prior transactions based on alleged third-party duress. 
In Sherman, the court annulled a marriage following a jury's verdict that the plaintiff was "threatened with the loss of his life and with imprisonment in the jail in the city of New York if he did not then and there marry the defendant" (Shearman, 20 N.Y.S. 414 [emphasis added]). This is however very different than the allegations set forth in the AC. To wit, the AC does not contain allegations of a similar nexus between Mr. Adler's decision to sell the Painting to J. Thannhauser at that time or at the price that he sold it, any direct consequence had he chosen not to do so, and/or J. Thannhauser's knowledge of any such consequences. What is however alleged in the AC is that there was a coercive environment created by Nazi Germany's appropriation of Mr. Adler's livelihood such that Mr. Adler needed money and that J. Thannhauser, as an opportunistic buyer, took advantage of this situation. Thus, Sherman appears to be inapposite and does not appear to support the result urged by the plaintiffs.
Aylaian v Town of Huntington involved a former employee's attempt to set aside a waiver and release of certain employment benefits and whether the release complied with the "totality of the circumstances" test under the Age Discrimination in Employment Act (the ADEA) and requirements of the Older Workers' Benefit Protection Act (the OWBPA). More specifically, the plaintiff was employed as a refuse collector for approximately 30 years. At the employee's termination he signed a release in a truck while with his friend Joseph Berbinach, who was not a lawyer. The release afforded the plaintiff benefits he would not otherwise been entitled to had he not resigned — i.e., lifetime health insurance. The United States District Court for the Eastern District of New York held that both the requirements of ADEA and OWBPA were satisfied and that having satisfied the more stringent federal waiver tests, the plaintiff otherwise failed to create an issue of fact arising under New York State contract law (Aylaian v. Town of Huntington, 762 F.Supp.2d 537 [2011]). On appeal, the United States Court of Appeals for the Second Circuit affirmed, holding:
Appellant's only colorable claim of duress is "third-party duress" from his close friend, Joseph Berbinach. Appellant admitted during his deposition that he had absolutely no contact with anyone representing the Town in regards to his resignation and early retirement. Although third-party duress may render a contract voidable, it cannot do so where the other contracting party gives value to the contract. See Restatement (Second) of Contracts § 175(2). Here, had Appellant not resigned, the Town would only have been obligated to pay 75% of Appellant's health benefits when he retired. Since Appellant resigned and retired early, the Town is paying 100% of his health benefits. Clearly, the Town has given value to the contract. Therefore, the agreement cannot be considered voidable because of third-party duress.
(Aylaian, 459 Fed Appx at 27 [emphasis added]). Thus, Aylaian too does not appear to support a claim predicated on third-party duress under New York law because the AC does not allege that Karl Adler was in contact with the Nazis or anyone associated with the Nazis in regards to his sale of the Painting and according to the AC, J. Thannhauser gave value (CHF 6,887 or approximately USD $1,552; NYSCEF Doc. No. 27, ¶ 46). 
Oquendo v. CCC Terek involved a contract between Fes Oquendo and CCC Terek for a guaranteed $1 million payment and guaranteed scheduled rematch with Ruslan Chagaev (111 F. Supp. 3d 389 [2015]). As relevant, Oqeundo brought suit alleging breach of contract based on CCC Terek's failure to pay him the $1 million he was promised and to arrange a rematch with Chagaev. The contract at issue was entered into with CCC Terek where the parties agreed that notwithstanding certain substantial personal hardships that Oqeundo faced which interfered with his focus and training that he would nonetheless go to Gorzny, Chechnya and fight Chagaev solely based on their agreement (i) that he would receive $1 million even if he lost and (ii) that he would be given a rematch (if in fact he lost). The parties had previously entered into an agreement for a different amount (which provided for a $225,000 purse) but also included language permitting Oquendo not to proceed where a physician certified that he was mentally or physically disabled to the extent that he should not participate in the bout as scheduled and that the parties would then reschedule or terminate the agreement. Subsequently, and before the scheduled bout, Oquendo's wife who was pregnant became very ill and was hospitalized. As a result, and based on his wife's and his son's medical conditions, Oquendo's training was interrupted, and he refused to commit to going forward with the fight. Ultimately, CCC Terek offered Oquendo $1 million and a guaranteed rematch if he lost in a new contract to induce him to agree to the fight and to get on a plane. When Oquendo did not jump at this new offer, CCC Terek sent a series of messages indicating that he and Oquendo would have serious problems unless Oqeundo got a doctor to certify he was not capable of fighting. Ultimately, Oquendo signed the new contract, boarded the plane, and fought Chagaev. He did not win the fight and was paid $225,000 (i.e., and not the $1 million). The rematch was never scheduled. When Oqeundo sued, CCC Terek argued that the contract was unenforceable based on third-party duress. The court rejected the argument holding:
In any event, under New York law 'duress by other than the opposing party to a contract can not constitute compulsion sufficient to void the contract. Evans v. Waldorf Astoria Corp., 827 F. Supp. 911, 914 (E.D.NY 1993) aff'd 33 F.3d 49 (2d Cir. 1994), although there is an exception when the promise had knowledge of or consented to the third party's [*14]actions, see 22 NY Jur.2d Contracts § 131. [FN7]
While the Court accepts that Oquendo knew that Muller-Michaelis was, indeed, under pressure to ensure Oquendo appeared for the fight, the record simply does not permit the required conclusion that his camp knew of or consented to threats of physical force by unknown Chechen officials. In plain terms, because the basic facts underlying Terek's third-party duress claim are essentially all speculation, this argument cannot succeed.
(Oquendo, 111 F. Supp at 409). Thus, the Court is constrained to hold that Oqeundo too does not appear to support the third-party duress claim asserted here under New York law because the AC does not allege that J. Thannhauser knew of or consented to (or that in fact there would be) any direct consequence by virtue of the failure to sell the Painting to him at the price that Karl Adler sold it. Put another way, nothing was threatened that would happen specifically if Adler refused to sell the Painting to J. Thannhauser when he did or at the price he did either by the Nazis or anyone collaborating with the Nazis.
The Oqendo court additionally held that even if duress could be established, dismissal was nonetheless required because CCC Terek ratified the contract by failing to act promptly to repudiate the contract:
Even assuming, however, that Terek or its agents assented to the contract under duress, Terek cannot now invoke such compulsion to render the contract unenforceable. Under New York law, "the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." VKK Corp., 244 F.3d at 122 (quoting DiRose v. PK Mgmt. Corp., 691 F.2d 628, 633—34 (2d Cir.1982)); accord *410Cappelli Enterprises, Inc. v. F & J Cont'l Food Corp., 16 AD3d 609, 610, 792 N.Y.S.2d 553 (N.Y.App.Div. 2d Dep't 2005). "A party may ratify a contract or release entered into under duress by 'intentionally accepting benefits under the contract,' by 'remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it,' or by 'acting upon it, performing under it, or affirmatively acknowledging it.' " VKK Corp., 244 F.3d at 123 (quoting In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir.1989)).
Significant for present purposes, the burden on the party seeking to avoid its contractual obligations "increases proportionately with the delay in initiating suit or otherwise repudiating the contract in question." Id. (quoting Int'l Halliwell Mines, 544 F.2d at 108). As the Second Circuit has explained, the requirement that the party seeking to avoid its contractual responsibilities promptly repudiate a contract is based on common sense and fairness:
The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the "heads I win, tails you lose" option of waiting to see how the arrangement works out and then [*15]deciding whether to seek to undo it ... [T]he requirement of prompt disavowal after execution is fair to the disadvantaged party, who will ordinarily know at the time he executes the instrument that he is being economically [or physically] coerced. He will therefore be able to disclaim the instrument immediately if he was forced into it by economic [or physical] duress and wishes to avoid its effect. Id. at 123—24. The record here establishes that not only did Terek accept the benefits of the July Contract, it made no attempt at prompt protest. Indeed, the only evidence before the Court concerning discussions about the contract after it was signed suggest that Terek understood it was enforceable.
(Oquendo, 11 F.Supp.3d at 409-410). This too would seem to suggest dismissal is required under New York law. As discussed above, the AC alleges that the Adlers accepted the proceeds from the Sale. The documentary evidence in the record includes Eric Adler's correspondence with the Guggenheim about the Painting, which correspondence does not mention any taint of duress with respect to the Sale. Neither Mr. Adler nor his heirs repudiated the Sale promptly despite the opportunity to do so. Thus, the Court is constrained to conclude that it appears that a finding of ratification is also appropriate also requiring dismissal (NYSCEF Doc. No. 27, ¶ 58; Philips S. Beach, LLC v ZC Specialty Ins. Co., 55 AD3d 493, 493-94 [1st Dept 2008]; Gershkovich v Shchukin Gallery Inc., 173 AD3d 641, 642 [1st Dept 2019]). 
As discussed above, inasmuch as the AC's causes of action are based on the assertion that the plaintiffs have an interest in the Painting because the Sale resulted from actionable duress under New York law and is therefore void or voidable, the Court is compelled to hold that the AC must be dismissed for this reason as well.
The Court has considered the plaintiffs' other arguments and finds them unavailing. 
Accordingly, it is hereby ORDERED that the motion to dismiss is GRANTED.
DATE 6/6/2024
ANDREW BORROK, J.S.C.

Footnotes

Footnote 1:This lawsuit was brought approximately 80 years after the Sale (hereinafter defined) took place, 47 years since the Guggenheim first contacted Eric Adler (son of the seller, Karl Adler) about the Painting's provenance, 45 years since both J. Thannhauser (hereinafter defined) and the Guggenheim Trustee who researched the Painting's provenance (Mr. Catton Rich, who had at least exchanged letters with Eric Adler) passed away, over 40 years after the Guggenheim accessioned the Painting, 27 years after the last of Mr. Adler's children passed away (i.e., including Eric Adler), eight years after Guggenheim's director, Mr. Thomas Messer, who oversaw the accession, passed away and five years after the HEAR act was enacted.

Footnote 2:The AC does not specifically state where or how the Sale took place. It does, however, indicate that J. Thannhauser was in Paris in 1938 and that the Adlers spent some (unspecified) time in France during this same period (NYSCEF Doc. No. 27, ¶ 42). 

Footnote 3:The AC does not allege that the Guggenheim in any way concealed the Painting's provenance and the Guggenheim in fact indicates that the Adlers' former ownership of the Painting was prominently identified (see, e.g., NYSCEF Doc. No. 41)

Footnote 4:Prague Holocaust Era Assets Conference: Terezin Declaration, Bureau of European and Eurasian Affairs, U.S. Department of State (June 30, 2009), https://2009-2017.state.gov/p/eur/rls/or/126162.htm.

Footnote 5:Although the district court in Zuckerman squarely rejected the duress argument, the Second Circuit affirmed on laches grounds because the passage of time meant that there were no witnesses who could testify on behalf of the Met or the purchasing dealer to argue the sale was legitimate or indeed even on behalf of the original owners to support the allegation that they had no other choice but to sell (Zuckerman, 928 F.3d at 194-95). The same is true here.

Footnote 6:Indeed, this highlights the difference between the facts of this case and Reif. Although the AC describes the appropriation of Mr. Adler's life and assets by the Nazis, the Painting itself was not appropriated by the Nazis by virtue of a tainted power of attorney or by Nazi collaborators, and the AC does not allege the threat by the Nazis or their collaborators of a direct consequence if Mr. Adler chose not to sell the Painting to J. Thannhauser. As discussed above, according to the AC, J. Thannhauser was an opportunistic buyer in a coercive market created by the Nazis.

Footnote 7:The Oquendo court noted that "[t]he Restatement (Second) of Contracts (1981) reverses the order of these propositions, providing that the general rule is that if a party's assent is induced under duress from a third party, the contract is voidable by the victim unless 'the other pary has, in good faith and without reason to know of the duress, given value or changed his position materially in reliance of the transaction.' § 175. The Second Circutit recently relied on this information in an unpublished opinion. See Aylaian v. Town of Huntitngon, 459 Fed.Appx. 25, 27 (2d Cir. 2012). Even under this approach, however, Terek's argument cannot succeed for the reasons discussed" (Oquendo, at n.12).